McDANIEL ᴇᴛ ᴀʟ. *v.* SÀNCHEZ ᴇᴛ ᴀʟ.

No. 80–180.   Argued March 2, 1981—Decided June 1, 1981

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 153. STEWART, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 154.

*Richard A. Hall* argued the cause and filed a brief for petitioners.

*Robert J. Parmley* argued the cause for respondents. With him on the brief was *David G. Hall.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Acting Assistant Attorney General Turner, Harriet S. Shapiro, Jessica Dunsay Silver,* and *Carol E. Heckman.*[*]

JUSTICE STEVENS delivered the opinion of the Court.

We granted certiorari to decide whether the preclearance requirement of § 5 of the Voting Rights Act of 1965, as amended,[1] applies to a reapportionment plan submitted to a

---

[*]Briefs of *amici curiae* urging affirmance were filed by *John B. Jones, Jr., Norman Redlich, William L. Robinson, Norman J. Chachkin,* and *Beatrice Rosenberg* for the Lawyers' Committee for Civil Rights Under Law; and by *Neil Bradley, Laughlin McDonald, Christopher Coates, Bruce J. Ennis,* and *E. Richard Larson* for the American Civil Liberties Union.

[1] The Voting Rights Act was enacted in 1965, 79 Stat. 437, and was amended in 1970, 84 Stat. 314, and in 1975, 89 Stat. 400. In relevant part, § 5, 89 Stat. 404, as set forth in 42 U. S. C. § 1973c, now provides: "[W]henever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the third sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to

Federal District Court by the legislative body of a covered
jurisdiction [2] in response to a judicial determination that the
existing apportionment of its electoral districts is unconsti-
tutional. Relying on *East Carroll Parish School Board* v.
*Marshall,* 424 U. S. 636 *(per curiam)*, the District Court held

voting different from that in force or effect on November 1, 1972, such
State or subdivision may institute an action in the United States District
Court for the District of Columbia for a declaratory judgment that such
qualification, prerequisite, standard, practice, or procedure does not have
the purpose and will not have the effect of denying or abridging the right
to vote on account of race or color, or in contravention of the guarantees
set forth in section 1973b (f) (2) of this title, and unless and until the
court enters such judgment no person shall be denied the right to vote
for failure to comply with such qualification, prerequisite, standard, prac-
tice, or procedure: *Provided,* That such qualification, prerequisite, stand-
ard, practice, or procedure may be enforced without such proceeding if the
qualification, prerequisite, standard, practice, or procedure has been sub-
mitted by the chief legal officer or other appropriate official of such State
or subdivision to the Attorney General and the Attorney General has not
interposed an objection within sixty days after such submission, or upon
good cause shown, to facilitate an expedited approval within sixty days
after such submission, the Attorney General has affirmatively indicated
that such objection will not be made."

[2] Section 4 of the Act identifies the jurisdictions that are subject to the
Act's prohibitions. One of the determinants of coverage is the use of a
"test or device" as a prerequisite for registration or voting. See 42
U. S. C. §§ 1973b (b), (c). In 1975, Congress enlarged the coverage of the
Act by changing the definition of "test or device" to protect non-English-
speaking citizens who constitute more than 5% of the voting age popula-
tion in any jurisdiction. The amendment provides:

"In addition to the meaning given the term under subsection (c) of
this section, the term 'test or device' shall also mean any practice or re-
quirement by which any State or political subdivision provided any regis-
tration or voting notices, forms, instructions, assistance, or other materials
or information relating to the electoral process, including ballots, only in
the English language, where the Director of the Census determines that
more than five per centum of the citizens of voting age residing in such
State or political subdivision are members of a single language minority."
89 Stat. 401–402, 42 U. S. C. § 1973b (f) (3).

As a result of this amendment, Texas and its political subdivisions became
covered jurisdictions. See *Briscoe* v. *Bell,* 432 U. S. 404.

that the plan submitted to it in this case was a judicial plan and thus excepted from the requirements of § 5. Relying on *Wise* v. *Lipscomb,* 437 U. S. 535, the Court of Appeals for the Fifth Circuit reversed; it held that because the plan had been prepared by a legislative body, it was a legislative plan within the coverage of § 5. We are persuaded that Congress intended to require compliance with the statutory preclearance procedures under the circumstances of this case. Accordingly, we affirm the judgment of the Court of Appeals.

The covered jurisdiction in this case is Kleberg County, a rural county in Texas. Under Texas law, a Commissioners Court, which is composed of four county commissioners presided over by the county judge, is authorized to govern Kleberg County. The county is divided periodically by the Commissioners Court into four commissioners' precincts, each of which elects a resident to the position of county commissioner. The county judge is elected at large. The county commissioners and the county judge serve 4-year terms.[3]

In January 1978, four Mexican-American residents of Kleberg County brought this class action against various county officials alleging that the apportionment of the four commissioners' precincts denied individual residents of the larger precincts a vote of equal weight, and unconstitutionally diluted the voting strength of the county's substantial Mexican-American population.[4] After a trial,[5] the District Court re-

---

[3] See generally Tex. Const., Art. 5, § 18; Tex. Rev. Civ. Stat. Ann., Art. 2351 (Vernon 1971). Elections are staggered in the four precincts so that two commissioners are elected every two years.

[4] The District Court certified two classes of Kleberg County voters as plaintiffs: (1) the class of all registered voters who were denied a vote of equal weight in the election of county commissioners due to the malapportionment of the commissioners' precincts; and (2) the class of all Mexican-American voters whose voting power had been diluted under the Kleberg County apportionment plan. See App. to Pet. for Cert. A-2, A-4.

[5] In February 1978, the District Court had refused to grant the plaintiffs preliminary relief enjoining the May 1978 primary elections, relying in part on the uncertainty of the statistical data presented by the

jected the plaintiffs' claim that the county's apportionment plan unconstitutionally diluted the voting power of Mexican-Americans as a class, but held that individual voters were denied equal representation because of the substantial disparity in the number of residents in each commissioners' precinct.[6] The District Court therefore directed the county officials to submit a proposed reapportionment plan to the court within six weeks, and scheduled a hearing on the validity of the proposal for four weeks thereafter.[7]

Pursuant to the District Court's order, the Commissioners Court undertook the task of devising a new apportionment plan. The Commissioners Court employed Dr. Robert Nash, a statistician and the Dean of the College of Business at Texas A. & I. University, to prepare a new plan, instructing him to define the commissioners' precincts "on a one-person/one-vote basis."[8] With one insignificant modifica-

---

plaintiffs to establish their claim of malapportionment. After the primary election, the Court of Appeals vacated the District Court's order denying a preliminary injunction and remanded for reconsideration in the light of its decision in *Lister* v. *Commissioners Court*, 566 F. 2d 490 (1978), which held that a Commissioners Court "had a clear duty to reapportion on the basis of the 1970 Census." *Id.*, at 492. Upon remand, the case proceeded to trial in the District Court.

[6] The 1970 census indicated that Kleberg County had 33,166 residents. If the precinct boundaries had been drawn to achieve perfect population equality, each precinct would have had 8,291 residents. In fact, however, the largest precinct contained 9,928 residents and the smallest only 6,702. The maximum deviation from the largest precinct to the smallest was therefore 38.9%. See App. to Pet. for Cert. A-5. This apportionment plan had been adopted in 1968, and the precincts had not been reapportioned following the 1970 census.

[7] In ordering the defendants to submit a proposed reapportionment plan, the District Court noted: "The initial burden of fashioning a constitutionally permissible remedy is on the County Commissioners Court." *Id.*, at A-19.

[8] Although the Commissioners Court employed Dr. Nash, he was not given extensive instructions with respect to preparation of the reapportion-

tion,[9] the Commissioners Court officially adopted the plan prepared by Dr. Nash as the plan it would submit to the District Court.

Respondents objected to the proposed plan. They challenged the data used by the Dean, they claimed that the plan diluted the voting strength of Mexican-Americans, and they contended that the Voting Rights Act required the county to obtain preclearance from the Attorney General of the United States or the United States District Court for the District of Columbia before the plan could become effective.[10] After an evidentiary hearing, the District Court rejected both of respondents' factual contentions, and held as a matter of law that the Voting Rights Act did not require preclearance. The court entered an order approving the new plan and authorizing the Commissioners Court to conduct the 1980 primary and general elections under it. See App. to Pet. for Cert. A-21 to A-23.

Without expressing any opinion with respect to the constitutionality of the new plan, the Court of Appeals vacated

---

ment plan. Dr. Nash's testimony in the District Court reveals that the plan's details were left largely within his discretion:

"Q. What instructions did you receive at the time of notification from Judge McDaniel in reference to drafting the new plan?

    .            •            •            •            •

"A. They wanted it broken down on a one-person/one-vote basis and that was the extent of their input on how I would do it." App. 25.

The Commissioners Court did not ask Dr. Nash to take into consideration geographical boundaries, previous county maintenance districts, or the ethnic balance of individual precincts. *Id.*, at 26. In drafting the plan, Dr. Nash was primarily influenced by population considerations; he also attempted to stay within the boundaries of existing voting precincts as much as possible. *Id.*, at 29-30.

[9] After Dr. Nash submitted his proposal, the Commissioners Court asked him to redraw one boundary in order to locate the county courthouse in Precinct One instead of Precinct Four. Because there were no residents on the only block affected by this change, see *id.*, at 28, no one contends that it was significant for purposes of this litigation.

[10] See n. 1, *supra.*

the District Court's order in a *per curiam* opinion. See 615 F. 2d 1023 (1980). Reasoning that "[a] proposed reapportionment plan submitted by a local legislative body does not lose its status as a legislative rather than court-ordered plan merely because it is the product of litigation conducted in a federal forum," *id.*, at 1024, the Court of Appeals held that the Voting Rights Act required preclearance. The court thereafter denied petitioners' application for a stay pending filing and consideration of a petition for writ of certiorari. On August 14, 1980, however, JUSTICE POWELL, in his capacity as Circuit Justice, entered an order recalling the mandate and staying the judgment of the Court of Appeals pending disposition of the petition for certiorari. 448 U. S. 1318. We granted that petition because the question presented is important and because the answer suggested by our prior opinions is not free of ambiguity. 449 U. S. 898.[11]

In this Court, the county officials contend that the Voting Rights Act does not apply to a plan that "(a) was prepared and presented in response to an order by the district court, (b) was not prepared by county officials but by a third party expert, (c) was not adopted by the county before submission to the court, (d) was considered by the trial court to be court-ordered, and (e) was put into effect only after county officials were ordered to do so by the trial court."[12]

We first consider the significance of the distinction between legislative and court-ordered plans as identified in our prior cases. We then review our decisions in *East Carroll*

---

[11] As JUSTICE POWELL noted in granting petitioners' application for a stay:

"It is fair to say that the opinions in *East Carroll* and *Wise* v. *Lipscomb* fall considerably short of providing clear guidance to the courts that initially address this difficult issue. It would be helpful, therefore, for this Court to exercise its responsibility to provide such guidance." 448 U. S., at 1322.

[12] Pet. for Cert. I; see also Brief for Petitioners II.

and *Wise* v. *Lipscomb*, on which the District Court and the Court of Appeals respectively placed primary reliance. Finally, we examine the statute and its legislative history.

## I

Texas and its political subdivisions are covered by the Voting Rights Act. *Briscoe* v. *Bell*, 432 U. S. 404.[13] Section 5 of that Act is applicable whenever a covered jurisdiction "shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972 . . . ." 42 U. S. C. § 1973c. A reapportionment plan is a "standard, practice, or procedure with respect to voting" within the meaning of § 5, *Georgia* v. *United States*, 411 U. S. 526, 531–535, and it is undisputed that Kleberg County is a covered jurisdiction. What is in dispute is whether that jurisdiction did "enact or seek to administer" a proposed reapportionment plan when it presented that plan to a Federal District Court as a proposed remedy for a constitutional violation. If the statute does apply, then the plan must be precleared either by the Attorney General of the United States or the United States District Court for the District of Columbia before it may become effective.[14] In such a preclearance proceeding, it is not sufficient to demonstrate that the new plan is constitutional; the covered jurisdiction also has the burden of demonstrating that the districting changes are not motivated by a discriminatory purpose and will not have an adverse impact on minority voters. See, *e. g., City of Rome* v. *United States*, 446 U. S. 156, 172–173.

---

[13] See n. 2, *supra*.

[14] In our prior decisions construing the Act, we have described in detail the preclearance procedures. See, *e. g., Allen* v. *State Board of Elections*, 393 U. S. 544; *South Carolina* v. *Katzenbach*, 383 U. S. 301; *Georgia* v. *United States*, 411 U. S. 526; *Morris* v. *Gressette*, 432 U. S. 491.

Two polar propositions are perfectly clear. First, the Act requires preclearance of new legislative apportionment plans that are adopted without judicial direction or approval. See *Georgia* v. *United States, supra.* Second, the Act's preclearance requirement does not apply to plans prepared and adopted by a federal court to remedy a constitutional violation. See *Connor* v. *Johnson,* 402 U. S. 690 *(per curiam).*[15] Petitioners contend that the Act does not apply to this reapportionment plan because it is a court-ordered plan, while respondents argue that the Act does apply because the plan was prepared and submitted on behalf of the local legislative body.

In prior reapportionment cases not arising under the Voting Rights Act, we have recognized important differences between legislative plans and court-ordered plans. Because "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court," *Chapman* v. *Meier,* 420 U. S. 1, 27, the Court has tolerated somewhat greater flexibility in the fashioning of legislative remedies for violation of the one-person, one-vote rule than when a federal court prepares its own

---

[15] In *Johnson,* the Court summarily rejected the suggestion that an apportionment plan formulated by a federal court must be submitted for preclearance under § 5:

"A decree of the United States District Court is not within reach of Section 5 of the Voting Rights Act." 402 U. S., at 691.

In his dissenting opinion in *Johnson,* Justice Black added:

"Needless to say I completely agree with the holding of the majority that a reapportionment plan formulated and ordered by a federal district court need not be approved by the United States Attorney General or the United States District Court for the District of Columbia. Under our constitutional system it would be strange indeed to construe § 5 of the Voting Rights Act of 1965, 79 Stat. 439, 42 U. S. C. § 1973c (1964 ed., Supp. V), to require that actions of a federal court be stayed and reviewed by the Attorney General or the United States District Court for the District of Columbia." *Id.,* at 695.

remedial decree. Thus, in *Chapman* we held that "unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Id.*, at 26–27 (footnote omitted).[16] In contrast, reapportionment plans prepared by legislative bodies may employ multimember districts and may result in greater population disparities than would be permitted in a court-ordered plan. See *Connor* v. *Finch*, 431 U. S. 407, 414–415. Cf. *Mahan* v. *Howell*, 410 U. S. 315.

In this case, we are concerned only with the question whether the reapportionment plan submitted to the District Court should be considered a legislative plan for purposes of preclearance under § 5. We are not presented with any question concerning the substantive acceptability of that plan. Nonetheless, we draw significant guidance from prior cases in which the substantive acceptability of a reapportionment plan, rather than the applicability of § 5, was at issue.

## II

In neither of the cases on which the respective parties now place their primary reliance did the Court predicate its decision on the Voting Rights Act. In both of those cases, the question before the Court was whether it was error for the District Court to approve the inclusion of a multimember district in the reapportionment plan under review.

In *East Carroll Parish School Board* v. *Marshall*, 424 U. S. 636 (*per curiam*), the plaintiff contended that population disparities among the parish's wards had unconstitutionally denied him the right to cast an effective vote for representatives to the school board and the police jury, the governing body of the parish. The District Court found that the

---

[16] *Chapman* involved reapportionment of the Legislature of North Dakota, a jurisdiction that is not covered by the Voting Rights Act.

parish's existing apportionment was unconstitutional. As a remedy, the court adopted a reapportionment plan, suggested by the police jury, that provided for at-large election of the members of both the police jury and the school board. Following the 1970 census, the District Court directed the police jury and school board to submit revised reapportionment plans. They resubmitted the plan calling for at-large elections, and the District Court again approved this plan. After a divided panel of the Court of Appeals affirmed the District Court's decision,[17] the court sitting en banc reversed on the ground that the multimember arrangement approved by the District Court was unconstitutional.[18]

When we reviewed the case, we concluded that it was improper for the Court of Appeals to base its decision on a constitutional ground in view of the fact that the District Court had violated the frequently reaffirmed "rule that when United States district courts are put to the task of fashioning reapportionment plans to supplant concededly invalid state legislation, single-member districts are to be preferred absent unusual circumstances." *Id.*, at 639. Thus, we held in *East Carroll* that the plan approved by the District Court was a judicial plan for purposes of substantive review.

Although the issue was not raised by the parties, we also stated in *East Carroll* that the plan was a judicial plan for purposes of § 5 preclearance. Neither of the parties had argued that § 5's preclearance requirement was applicable in that case. However, the United States, as *amicus curiae*, had contended that, because the plan had been submitted by the

---

[17] See *Zimmer* v. *McKeithen*, 467 F. 2d 1381 (CA5 1972).

[18] See *Zimmer* v. *McKeithen*, 485 F. 2d 1297 (CA5 1973) (en banc). In the Court of Appeals, the appellants had also argued that the at-large election was not permitted by state law because the Louisiana statute that authorized the use of multimember districts had never become effective since it had not been precleared pursuant to § 5 of the Voting Rights Act. See 485 F. 2d, at 1301–1302, and n. 7.

legislative bodies of a covered jurisdiction, preclearance was required. We rejected that argument in a footnote:

> "[C]ourt-ordered plans resulting from equitable jurisdiction over adversary proceedings are not controlled by § 5. Had the East Carroll police jury reapportioned itself on its own authority, clearance under § 5 of the Voting Rights Act would clearly have been required. *Connor* v. *Waller,* 421 U. S. 656 (1975). However, in submitting the plan to the District Court, the jury did not purport to reapportion itself in accordance with the 1968 enabling legislation . . . which permitted police juries and school boards to adopt at-large elections. App. 56. Moreover, since the Louisiana enabling legislation was opposed by the Attorney General of the United States under § 5 of the Voting Rights Act, the jury did not have the authority to reapportion itself. . . . Since the reapportionment scheme was submitted and adopted pursuant to court order, the preclearance procedures of § 5 do not apply. *Connor* v. *Johnson,* 402 U. S. 690, 691 (1971)." 424 U. S., at 638–639, n. 6.

Petitioners rely heavily upon this footnote. While their reliance is understandable, the footnote is not dispositive in this case. The discussion of § 5 in *East Carroll* was dictum unnecessary to the decision in that case. It is, therefore, not controlling in this case, in which the impact of § 5 is directly placed in issue.[19] Moreover, our subsequent decision in *Wise*

---

[19] THE CHIEF JUSTICE, in his concurring opinion in *East Carroll,* pointed out that the Court's discussion of the preclearance issue was dictum:

"I consider it unnecessary to reach the question discussed, *ante,* at 638–639, n. 6. It was, as the Court observes in n. 6, 'not raised by the petitioners, nor did respondent file a cross-petition.' The scope of § 5 of the Voting Rights Act is an important matter, and I would not undertake to express any view on what the Court discusses by way of dicta in n. 6." 424 U. S., at 640.

To the extent that the dictum in the *East Carroll* footnote is inconsistent with our holding today, that dictum is disavowed.

v. *Lipscomb,* 437 U. S. 535, indicates that, at least to the extent that *East Carroll* addressed the Voting Rights Act, it must be narrowly limited to its particular facts.

In *Wise* v. *Lipscomb,* the District Court held that the system of at-large election to the Dallas City Council unconstitutionally diluted the voting strength of black citizens. The court thereafter gave the City Council an opportunity to prepare and submit a new apportionment plan. In response, the City Council passed a resolution stating the Council's intention to pass an ordinance providing· for the election of eight council members from single-member districts, and for the election of the three remaining members from the city at large. The District Court conducted a hearing " 'to determine the constitutionality of the new proposed plan' " and held that it was "a valid legislative Act." See 437 U. S., at 538–539. The Court of Appeals reversed, relying on *East Carroll* to hold that it was error for the District Court merely to evaluate the new plan under constitutional standards without also deciding whether exceptional circumstances justified the inclusion of a multimember district in that judicially imposed reapportionment plan. See 551 F. 2d 1043 (CA5 1977).

The question this Court addressed was whether the District Court had committed error by failing to apply the usual presumption against multimember districts in judicial reapportionment plans. In his opinion announcing the judgment of the Court, JUSTICE WHITE, joined by JUSTICE STEWART, answered that question by holding that the presumption did not apply because it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." 437 U. S., at 540. JUSTICE WHITE distinguished *East Carroll* on the ground that the legislative bodies in that case had not purported to reapportion themselves and, indeed, had been without power to reapportion

themselves under state law because the Louisiana enabling statute had been invalidated under the Voting Rights Act.[20] The Dallas City Council, in contrast, had acted within its inherent legislative authority in devising and submitting a reapportionment plan to replace the plan invalidated by the District Court in *Wise*. See 437 U. S., at 545–546.

JUSTICE POWELL's separate opinion concurring in part and concurring in the judgment, was joined by the THE CHIEF JUSTICE, JUSTICE BLACKMUN, and JUSTICE REHNQUIST. JUSTICE POWELL agreed with JUSTICE WHITE's conclusion that the Dallas reapportionment plan was a legislative plan for purposes of the application of the presumption against multimember districts. However, relying upon *Burns* v. *Richardson*, 384 U. S. 73, JUSTICE POWELL disagreed with JUSTICE WHITE's suggestion that *East Carroll* had held that a proposed reapportionment plan may be considered legislative only if the legislative body that suggested the plan had authority to enact it under state law. 437 U. S., at 548.[21] In

---

[20] JUSTICE WHITE explained why *East Carroll* did not support the judgment of the Court of Appeals:

"[W]e emphasized [in *East Carroll*] that the bodies which submitted the plans did not purport to reapportion themselves and, furthermore, could not even legally do so under federal law because state legislation providing them with such powers had been disapproved by the Attorney General of the United States under § 5 of the Voting Rights Act of 1965. 424 U. S., at 638 n. 6, 637 n. 2. Under these circumstances, it was concluded that the mere act of submitting a plan was not the equivalent of a legislative Act of reapportionment performed in accordance with the political processes of the community in question." 437 U. S., at 545.

[21] The District Court in *Burns*, after striking down Hawaii's Senate apportionment scheme, directed the legislature to enact a proposed interim plan pending the constitutional amendment required for reapportionment under Hawaii law. See 384 U. S., at 80–81. The legislature complied with the court's order, but the court found the proposed interim plan unacceptable. On appeal, this Court treated the proposed plan as a legislative plan, despite the fact that the Hawaii Legislature was without power to reapportion itself absent a constitutional amendment.

JUSTICE POWELL's view, the legislative body's authority under state law was irrelevant to the question before the Court. He explained that the critical difference between a legislative plan and a court-imposed plan for purposes of substantive review was that the former reflected the policy choices of the elected representatives of the people, whereas the latter represented the remedial directive of a federal court.[22] Deference to the judgment of the legislative body was required even if that body lacked authority under state law to adopt the proposed reapportionment plan.[23]

In dissent, JUSTICE MARSHALL, joined by JUSTICE BRENNAN and JUSTICE STEVENS, expressed the opinion that *Wise* was indistinguishable from *East Carroll* and that the Court of Appeals therefore had correctly applied the presumption

---

[22] JUSTICE POWELL's opinion made it plain that the crucial factor was the legislature's exercise of its judgment, not its legislative power:

"The essential point is that the Dallas City Council exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people, rather than the remedial directive of a federal court. . . . Th[e] rule of deference to local legislative judgments remains in force even if, as in *Burns,* our examination of state law suggests that the local body lacks authority to reapportion itself." 437 U. S., at 548.

[23] In reaching this conclusion, JUSTICE POWELL read *East Carroll* "as turning on its peculiar facts":

"Because the brief *per curiam* in *East Carroll* did not even cite *Burns,* I would read it as turning on its peculiar facts. In response to the litigation in *East Carroll,* the legislature enacted a statute enabling police juries and school boards to reapportion themselves by employing at-large elections. That enabling legislation was disapproved by the Attorney General of the United States under § 5 of the Voting Rights Act of 1965 . . . because of its impermissible impact on Negro voters. This determination meant that the specific plans proposed by the school board and police jury in that case would have had unlawful effects. Because their legislative judgment had been found tainted in that respect, it followed that the normal presumption of legitimacy afforded the balances reflected in legislative plans . . . could not be indulged. To the extent that *East Carroll* implies anything further about the principle established in *Burns,* the latter must be held to control." 437 U. S., at 549.

against multimember districts. 437 U. S., at 550–554. JUS-TICE MARSHALL, however, agreed with the majority that it would not be proper to reach any question under the Voting Rights Act because Texas had not been subject to the Act when the case was pending in the District Court.[24]

While it is clear that *Wise,* like *East Carroll,* did not require the Court to decide any statutory issue, the references to § 5 of the Voting Rights Act in JUSTICE WHITE's opinion announcing the judgment of the Court are nevertheless instructive. After pointing out that "the distinctive impact" of § 5 upon the power of the States to reapportion themselves must be observed in the normal case, 437 U. S., at 541–542, JUSTICE WHITE stated:

> "Plans imposed by court order are not subject to the requirements of § 5, but under that provision, a State or political subdivision subject to the Act may not 'enact or seek to administer' any 'different' voting qualification or procedure with respect to voting without either obtaining a declaratory judgment from the United States District Court for the District of Columbia that the pro-

---

[24] At the outset of his opinion, JUSTICE MARSHALL summarized his position:

"I agree with the majority's decision not to reach the Voting Rights Act question, since it was not presented to either of the courts below. I also agree with the analysis of our past decisions found in Part II of MR. JUSTICE WHITE's opinion. I cannot agree, however, that the actions of the Dallas City Council are distinguishable from those of the local governing body in *East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636 (1976). I therefore conclude that the plan ordered by the District Court here must be evaluated in accordance with the federal common law of remedies applicable to judicially devised reapportionment plans." *Id.,* at 550.

In his opinion announcing the judgment of the Court, JUSTICE WHITE pointed out that Texas had not been subject to the Voting Rights Act when the case was pending in the District Court. *Id.,* at 542. JUSTICE POWELL also agreed with the decision not to address the Voting Rights Act. *Id.,* at 549.

posed change 'does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color' or submitting the change to the Attorney General and affording him an appropriate opportunity to object thereto. A new reapportionment plan enacted by a State, including one purportedly adopted in response to invalidation of the prior plan by a federal court, will not be considered 'effective as law,' *Connor* v. *Finch,* 431 U. S., at 412; *Connor* v. *Waller,* 421 U. S. 656 (1975), until it has been submitted and has received clearance under § 5. Neither, in those circumstances, until clearance has been obtained, should a court address the constitutionality of the new measure. *Connor* v. *Finch, supra; Connor* v. *Waller, supra." Id.,* at 542 (footnote omitted).

Neither *East Carroll* nor *Wise* decided the precise question that is now presented. Nonetheless, both JUSTICE WHITE's opinion and JUSTICE POWELL's opinion surely foreshadowed the holding we announce today. For both opinions indicate that the fact that the reapportionment plan before us was devised in response to an order of a federal court does not change its character as a legislative plan. In addition, JUSTICE POWELL's opinion indicates that the Commissioners Court's power under Texas law to adopt this plan should be irrelevant to the decision in this case.

### III

This is not a case in which the language of the controlling statute unambiguously answers the question presented. The Solicitor General, on behalf of the United States as *amicus curiae,* contends that a covered jurisdiction "seek[s] to administer" a new voting practice when it submits a redistricting plan to a district court as a proposed remedy for a constitutional violation. This is a plausible but not an obviously correct reading of the statutory language. For there is force to the contrary argument that Kleberg County had no in-

tention to administer any new plan until after it was given legal effect by incorporation in a judicial decree. Arguably, therefore, the statute has no application before the District Court enters its decree, and because the Act does not require the District Court to have its decisions precleared, see *Connor* v. *Johnson,* 402 U. S. 690, once such a decree is entered it is too late for the statute to qualify the county's duty to administer the plan as entered by the District Court. We find sufficient ambiguity in the statutory language to make it appropriate to turn to legislative history for guidance.

In 1975, when Congress adopted the amendments that ultimately brought Texas and Kleberg County within the coverage of the Act, it directed special attention to § 5 and to the redistricting that would be required after the 1980 census.[25] In its Report on S. 1279, the bill that extended the life of the Voting Rights Act beyond 1975, the Senate Committee on the Judiciary explained "the future need for the Act" by pointing out that redrafting of district lines to correct violations of the one-person, one-vote rule created opportunities to disenfranchise minority voters.[26] "By providing that Sec-

---

[25] Because the 1975 extension of the Voting Rights Act is the controlling statute in this case, the legislative history of that extension is of particular relevance. See *Dougherty County Board of Education* v. *White,* 439 U. S. 32, 46.

[26] The Senate Report emphasized the importance of the preclearance procedure:

"The provisions of S. 1279 propose to amend the Act so that the special remedies, including Section 5 preclearance, will be operative for an additional ten years. Although the 1965 legislation and the 1970 amendments did, in large part, provide for only five year coverage periods at a time, the Committee concludes that it is imperative that a ten year extension now be adopted in order to insure the applicability of Section 5 protections during the reapportionment and redistricting which will take place subsequent to the 1980 Decennial Census.

"Approximately one-third of the Justice Department's objections have been to redistrictings at the state, county and city levels. (S. Hearings 539–540, 581–582). This past experience ought not be ignored in terms

148

tion 5 protections not be removed before 1985, S. 1279 would guarantee Federal protection of .minority voting rights during the years that the post-census redistrictings will take place." [27]

The Committee unambiguously stated that the statutory protections are to be available even when the redistricting is ordered by a federal court to remedy a constitutional violation that has been established in pending federal litigation. The Committee Report is crystal clear on this point:

"Thus, for example, where a federal district court holds unconstitutional an apportionment plan which predates the effective date of coverage under the Voting Rights Act, any subsequent plan ordinarily would be subject to Section 5 review. In the typical case, the court either will direct the governmental body to adopt a new plan and present it to the court for consideration or else itself choose a plan from among those presented by various parties to the litigation. In either situation, the court should defer its consideration of—or selection among—any plans presented to it until such time as these plans have been submitted for Section 5 review. Only after such review should the district court proceed to any remaining fourteenth or fifteenth amendment questions that may be raised.

"The one exception where Section 5 review would not ordinarily be available is where the court, because of

of assessing the future need for the Act. It is ironic that the Supreme Court's 'one man-one vote' ruling [*Reynolds* v. *Sims*, 377 U. S. 533 (1964)] has created opportunities to disfranchise minority voters. Having to redraft district lines in compliance with that ruling, jurisdictions may not always take care to avoid discriminating against minority voters in that process. By providing that Section 5 protections not be removed before 1985, S. 1279 would guarantee Federal protection of minority voting rights during the years that the post-census redistrictings will take place." S. Rep. No. 94–295, pp. 17–18 (1975) (footnote omitted) (Senate Report).
[27] *Id.*, at 18.

exigent circumstances, actually fashions the plan itself instead of relying on a plan presented by a litigant. This is the limited meaning of the 'court decree' exception recognized in *Connor* v. *Johnson,* 402 U. S. 690 (1971). Even in these cases, however, if the governmental body subsequently adopts a plan patterned after the court's plan, Section 5 review would be required, *Connor* v. *Waller,* supra. Furthermore, in fashioning the plan, the court should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases." Senate Report, at 18–19.[28]

The view expressed by the Committee is consistent with the basic purposes of the statute and with the well-settled rule that § 5 is to be given a broad construction. See, *e. g., Dougherty County Board of Education* v. *White,* 439 U. S. 32, 38; *United States* v. *Sheffield Board of Commissioners,* 435 U. S. 110, 122–123; *Perkins* v. *Matthews,* 400 U. S. 379, 387. The preclearance procedure is designed to forestall the danger that local decisions to modify voting practices will impair minority access to the electoral process.[29] The federal interest in preventing local jurisdictions from making changes that adversely affect the rights of minority voters is the same whether a change is required to remedy a constitutional. violation or is merely the product of a community's

---

[28] The Committee went on to state that, in its judgment, § 5 had been properly applied by the District Court in *Gaillard* v. *Young,* No. 74–1265 (SC 1975). In *Gaillard,* the District Court invalidated an existing apportionment plan and directed that any remedial plan proposed by the parties be precleared by the Attorney General before it would be embodied in a final decree. Senate Report, at 19. In their brief in this case, petitioners conceded that *Gaillard* "involved facts identical to those in this case." Brief for Petitioners 25.

[29] See, *e. g., South Carolina* v. *Katzenbach,* 383 U. S. 301; *Allen* v. *State Board of Elections,* 393 U. S. 544.

perception of the desirability of responding to new social patterns.[30]

. It is true, of course, that the federal interest may be protected by the federal district court presiding over voting rights litigation, but sound reasons support the Committee's view that the normal § 5 preclearance procedures should nevertheless be followed in cases such as this.[31]   The procedures

---

[30] Moreover, even after a federal court has found a districting plan unconstitutional, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise* v. *Lipscomb,* 437 U. S., at 539 (opinion of WHITE, J.). See also *Chapman* v. *Meier,* 420 U. S. 1, 27.  Our prior decisions in the apportionment area indicate that, in the normal case, a court that has invalidated a State's existing apportionment plan should enjoin implementation of that plan and give the legislature an opportunity to devise an acceptable replacement before itself undertaking the task of reapportionment.  See, *e. g., Reynolds* v. *Sims,* 377 U. S. 533, 585–586; *Maryland Committee* v. *Tawes,* 377 U. S. 656, 676; *Davis* v. *Mann,* 377 U. S. 678, 693; *Ely* v. *Klahr,* 403 U. S. 108, 114, and n. 6.  Cf. *Gaffney* v. *Cummings,* 412 U. S. 735, 749.  "[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds, supra,* at 586; *Burns* v. *Richardson,* 384 U. S., at 85.  Thus, in the normal case, the legislature will enact an apportionment plan to replace that invalidated by the court; such a plan clearly must be precleared under § 5.  See *Connor* v. *Waller,* 421 U. S. 656 *(per curiam).*

[31] Our decision in *United States* v. *Board of Supervisors of Warren County,* 429 U. S. 642 *(per curiam),* illustrates that a District Court's conclusion that a reapportionment plan proposed by a covered jurisdiction complies with constitutional requirements is not a substitute for § 5 review. In *Warren County,* the Attorney General filed a § 5 action in the District Court.  The court enjoined the county from implementing an apportionment plan that had not been precleared under § 5, and directed it to submit a new plan for preclearance.  When the county was unable to obtain the Attorney General's approval for either of two proposed plans, it submitted the plans to the District Court.  The court adopted one of the plans despite the county's failure to obtain the Attorney General's approval, finding that the plan neither diluted minority voting strength nor violated the one-person, one-vote principle.  *Id.,* at 643–644.  This Court reversed,

contemplated by the statute reflect a congressional choice in favor of specialized review—either by the Attorney General of the United States or by the United States District Court for the District of Columbia. Because a large number of voting changes must necessarily undergo the preclearance process, centralized review enhances the likelihood that recurring problems will be resolved in a consistent and expeditious way.[32] Moreover, if covered jurisdictions could avoid the normal preclearance procedure by awaiting litigation challenging a refusal to redistrict after a census is completed, the statute might have the unintended effect of actually encouraging delay in making obviously needed changes in district boundaries. The federal interest in evenhanded review of all changes in covered jurisdictions is furthered by the application of the statute in cases such as this.

The application of the statute is not dependent on a showing that the county's proposed plan is defective in any way. Cf. *United States* v. *Board of Supervisors of Warren County,* 429 U. S. 642 (*per curiam*); *Morris* v. *Gressette,* 432 U. S. 491. The prophylactic purposes of the § 5 remedy are achieved by automatically requiring "review of *all* voting changes prior to implementation by the covered jurisdictions." Senate Report, at 15 (emphasis supplied).[33] It is therefore not material that the plan submitted by the Com-

---

holding that it was error for the District Court to determine the constitutional validity of the county's plan and to order that it be implemented, rather than limiting its inquiry in the § 5 suit to the question whether the county had complied with § 5.

[32] For example, in 1976, covered jurisdictions submitted 7,470 proposed changes to the Department of Justice for preclearance under § 5; the Department interposed objections to 62 of those submissions. See Hearings before the Subcommittee on Civil and Constitutional Rights, House Committee on the Judiciary, GAO Report on the Voting Rights Act, 95th Cong., 2d Sess., 35–36 (1978) (statement of Drew S. Days III, Assistant Attorney General, Civil Rights Division).

[33] See also H. R. Rep. No. 94–196, pp. 5, 8–11 (1975); H. R. Rep. No. 91–397, pp. 6–8 (1969).

missioners Court of Kleberg County in this case was actually prepared by an independent expert. His expertise may facilitate the satisfactory completion of the preclearance process, but it does not obviate the preclearance requirement itself. For just as the reasons for the county's decision to propose a new plan are irrelevant to the statutory preclearance requirement, so also is the particular method that is employed in formulating the plan that is submitted to the court on behalf of the county irrelevant.

The application of the statute also is not dependent upon any showing that the Commissioners Court had authority under state law to enact the apportionment plan at issue in this case.[34] As JUSTICE POWELL pointed out in *Wise* v. *Lipscomb,* 437 U. S. 535, the essential characteristic of a legislative plan is the exercise of legislative judgment. The fact that particular requirements of state law may not be satisfied before a plan is proposed to a federal court does not alter this essential characteristic. The applicability of § 5 to specific

---

[34] The parties appear to agree that the Commissioners Court had authority under Texas law to redraw the boundaries of the commissioners' precincts. Petitioners contend, however, that the Commissioners Court was without power to adopt the particular apportionment plan at issue in this case because it is permitted to redraw the boundaries of *election* precincts only in a July or August term. The plan in this case was submitted to the District Court in November and was approved by that court in January. See Tex. Elec. Code Ann., Art. 2.04 (1) (Vernon Supp. 1980). Election precincts are subunits of commissioners' precincts that determine where a voter registers and votes. Because the reapportionment plan submitted by the Commissioners Court resulted in the splitting of several election precincts between two commissioners' precincts, petitioners contend that the plan altered the boundaries of election precincts in violation of state law. Since we conclude that the Commissioners Court's authority under Texas law to enact this plan is irrelevant for purposes of § 5 coverage, we need not resolve this question of state law. At any rate, it is clear that the Commissioners Court possesses general authority to reapportion itself; petitioners challenge only the timing of the submission and adoption of the plan in this case.

remedial plans is a matter of federal law that federal courts should determine pursuant to a uniform federal rule.

As we construe the congressional mandate, it requires that whenever a covered jurisdiction submits a proposal reflecting the policy choices of the elected representatives of the people—no matter what constraints have limited the choices available to them—the preclearance requirement of the Voting Rights Act is applicable.[35] It was, therefore, error for the District Court to act on the county's proposed plan before it had been submitted to the Attorney General or the United States District Court for the District of Columbia for preclearance.

The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*

JUSTICE POWELL, concurring.

The decision today is foreshadowed by *Wise* v. *Lipscomb,* 437 U. S. 535 (1978), and I join the Court's opinion. The constitutionality of § 5 of the Voting Rights Act of 1965 has been sustained by prior cases. If the question were presented for reconsideration, I would adhere to the contrary view as previously expressed. *City of Rome* v. *United States,* 446 U. S. 156, 193 (1980) (POWELL, J., dissenting); *Dougherty County Bd. of Ed.* v. *White,* 439 U. S. 32, 48 (1978) (POWELL, J., dissenting); *Georgia* v. *United States,* 411 U. S. 526, 545 (1973) (POWELL, J., dissenting). See also *United States* v. *Sheffield Board of Commissioners,* 435 U. S. 110, 141 (1978) (STEVENS, J., dissenting); *Allen* v. *State Board of Elections,* 393 U. S. 544, 586, and n. 4 (1969) (Harlan, J., concurring

---

[35] Petitioners argue that the interposition of a preclearance requirement will encourage dilatory tactics by incumbents who will continue to represent malapportioned districts during the review process. The district courts, however, have ample power to fashion interim remedies to avoid problems of this character.

in part and dissenting in part); *South Carolina* v. *Katzenbach,* 383 U. S. 301, 358 (1966) (Black, J., concurring and dissenting).*

JUSTICE STEWART, with whom JUSTICE REHNQUIST joins, dissenting.

In *East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636, 638–639, n. 6, the Court expressly stated that a reapportionment scheme which is submitted and adopted pursuant to a court order does not have to be approved through the preclearance procedures of § 5 of the Voting Rights Act. This statement represented the deliberate and considered view of the Court, as demonstrated by the presence of a separate opinion in the case questioning the Court's resolution of the issue. See *id.,* at 640 (concurring opinion). Because I believe that what the Court said in the *East Carroll* case expressly controls the result in this case, I respectfully dissent.

---

*In his dissent, Justice Black stated that his "objection to § 5 is that [it] . . . conflict[s] with the most basic principles of the Constitution." 383 U. S., at 358. Justice Black added:

"Section 5, by providing that some of the States cannot pass state laws or adopt state constitutional amendments without first being compelled to beg federal authorities to approve their policies, so distorts our constitutional structure of government as to render any distinction drawn in the Constitution between state and federal power almost meaningless. One of the most basic premises upon which our structure of government was founded was that the Federal Government was to have certain specific and limited powers and no others, and all other power was to be reserved either 'to the States respectively, or to the people.' Certainly if all the provisions of our Constitution which limit the power of the Federal Government and reserve other power to the States are to mean anything, they mean at least that the States have power to pass laws and amend their constitutions without first sending their officials hundreds of miles away to beg federal authorities to approve them." *Id.,* at 358–359. The right freely to vote must be safeguarded vigilantly. If a state law denies or impairs this right, in violation of the Constitution or of a valid federal law, the courts are the proper and traditional forum for redress.