IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-6100

_____


JESSE CAMPOS, W. R. (RESENDEZ) MORRIS,
AND MEXICAN AMERICAN BAR ASSOCIATION
OF HOUSTON,

Plaintiffs-Appellants,

versus

CITY OF HOUSTON, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Southern District of Texas
_____
( July 31, 1992 )

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

PER CURIAM:

On our own motion, we withdraw our prior opinion reported at 960 F.2d 26, and substitute the following:

The district court required that the November 1991 Houston City Council election be conducted under a reapportionment plan objected to by the Attorney General of the United States. Because we find that the district court abused its discretion, we VACATE the judgment of the district court and REMAND the case for such further proceedings, if any, that may be necessary.

I

In 1979, the City of Houston adopted a form of government consisting of a fifteen-member council, including the mayor, who is also a member of the council ("Plan 9-5-1 #1). All are elected for concurrent two-year terms. Nine of the council members are elected from single-member districts; six, including the mayor, are chosen at large.

In April 1991, the Hispanic citizens filed suit against the City, alleging that the at-large elections for council members dilute Hispanic voting strength in violation of Section 2 of the Voting Rights Act of 1965 (as amended), 42 U.S.C. § 1973, and the Fourteenth Amendment to the United States Constitution. The Hispanic citizens asked the district court to enjoin all future elections under the at-large scheme and to order into effect a 22-member City Council. The City of Houston moved for summary judgment; that motion is pending before the district court.

Meanwhile, 1990 census data had revealed that the nine single-member districts in Plan 9-5-1 #1 were significantly unequal in population, in violation of the one-person, one-vote requirements of the Fourteenth Amendment. Accordingly, on June 5, 1991, the City of Houston adopted a redistricting plan for the nine single-member districts, using 1990 census data ("Plan 9-5-1 #2"). On that same day, the City also adopted an alternative redistricting plan consisting of sixteen single-member districts, which was to be implemented if an August 10 charter revision election on the issue

was successful. On July 9, the City submitted both alternative plans to the Attorney General of the United States, as required by Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. In the August 10 City Charter revision election, the sixteen single-member district alternative reapportionment plan was rejected by the voters; therefore, the Attorney General did not consider that alternative.

On August 21, the Attorney General requested more information regarding Plan 9-5-1 #2. The Attorney General requested that the City respond to specific allegations that the Department of Justice had received from the Hispanic community in Houston that the plan discriminated against them. The City made several responses to the Attorney General's request, but did not complete its submission until September 27. The City proceeded with steps to implement the unprecleared Plan 9-5-1 #2 in preparation for the scheduled November 5 election.

On October 4, the Attorney General interposed a timely objection to the proposed Plan 9-5-1 #2 pursuant to Section 5 of the Voting Rights Act. On October 7, the City filed a motion for leave to file a supplemental counterclaim against the Hispanic citizens in the Section 2 action. In the counterclaim, the City asked for a declaration regarding the constitutionality of the malapportioned Plan 9-5-1 #1, and requested that the district court order that Plan 9-5-1 #2 (the plan to which the Attorney General had objected) be used as an interim plan for the November 5 City

Council elections. The United States Attorney General moved to participate as an _amicus_ and filed a detailed brief objecting to the jurisdiction of the court. At a hearing on October 9, the City presented testimony from election officials that it would be physically impossible to hold the November 5 election under any plan other than Plan 9-5-1 #2, the one objected to by the Attorney General. At the conclusion of that hearing, the court directed the parties to meet and attempt to settle the issues. The hearing was continued until October 11.

A few hours before the October 11 hearing, the Houston City Council adopted an entirely different plan of apportionment of the nine single-member council districts ("Plan 9-5-1 #3), and immediately submitted it to the Department of Justice via telefax for preclearance. At the hearing that afternoon, counsel for the City announced to the district court that the City had been unable to reach an agreement with the Hispanic citizens. However, the City urged the court to adopt Plan 9-5-1 #3 as an interim plan pending preclearance.

At the conclusion of the hearing, the court stated that it had three plans before it: (1) the malapportioned Plan 9-5-1 #1, under which members of the Houston City Council were elected during the 1980s; (2) Plan 9-5-1 #2, to which the Department of Justice had objected; and (3) Plan 9-5-1 #3, which had been passed by the City Council only hours before the hearing. The City urged that the court not order it to use Plan 9-5-1 #1, because it was based on

the 1980 census and presumably had large population deviations among the districts. The Hispanic citizens opposed Plan 9-5-1 #2, because it had been objected to by the Department of Justice. They did not support the new Plan 9-5-1 #3, although they acknowledged that it was an improvement over Plan 9-5-1 #2.

On October 12, before the district court issued its ruling, the Attorney General precleared Plan 9-5-1 #3, subject to reconsideration in the event that new information came to his attention before the expiration of the sixty-day period within which he is allowed to object to plans submitted by covered jurisdictions. A copy of the preclearance letter was sent by telefax to the district court. Later that afternoon, however, the district court ordered that the November 5 elections be conducted under unprecleared Plan 9-5-1 #2. The court reasoned that, although Plan 9-5-1 #3 had been precleared, it should not be used, because the Hispanic citizens objected to it, and the Attorney General might change his mind.

On October 16, the Hispanic citizens moved for a stay, which the district court denied the following day. On October 18, the Hispanic citizens sought a stay from this court, which was denied on October 24. The Hispanic citizens' request for relief from the United States Supreme Court was also denied.

On October 17, the United States filed a separate enforcement action against the City of Houston seeking to enjoin the November 5 election because it was proceeding under an unprecleared plan of

apportionment.  United States v. City of Houston, No. H-91-3076 (S.D. Tex.).  In the alternative, the United States requested that special elections, under a precleared plan, be scheduled as soon as practicable.  A three-judge panel was convened, and a hearing was set for October 28.  On October 29, the three-judge panel refused to grant the injunction, noting:

> The Fifth Circuit's denial of a stay operated on the understanding that Judge Hittner's order represents a temporary expedient. . . .  The City cannot plausibly contend on the one hand that Judge Hittner's order represents an interim plan and then on the other hand, aver that the office holders elected in next Tuesday's election will continue in office for the entire terms.  As far as this court is concerned, the interim order of Judge Hittner, if affirmed by the Fifth Circuit, will require an election under a constitutional, precleared or court imposed districting scheme in far less than two years.

The Hispanic citizens timely appealed, and the United States filed an amicus brief supporting the Hispanic citizens' position.

II

The Hispanic citizens and the United States argue that the district court lacked jurisdiction or otherwise exceeded its authority in granting relief on the City's counterclaim because (1) the counterclaim did not present a justiciable "case or controversy"; and (2) the counterclaim is an action under Section 5 of the Voting Rights Act and, therefore, only a three-judge court authorized to decide Section 5 issues could have ordered the relief sought by the City.  We conclude that the district court had the power to grant some form of interim relief, but that it abused its

-6-

discretion in ordering the election to be conducted under unprecleared Plan 9-5-1 #2, to which the Attorney General had interposed a timely objection.

A

The Hispanic citizens and the United States contend that the City's counterclaim did not present a justiciable case or controversy because the Hispanic citizens' Section 2 action related solely to the at-large seats, and they had not filed a malapportionment challenge to Plan 9-5-1 #1. We disagree. Although the procedural context in which the counterclaim was filed is rather unusual, we conclude that the requirements of Article III were satisfied. Under state law, the City was required to conduct the election as scheduled; but the only precleared apportionment plan available after the Attorney General objected to Plan 9-5-1 #2 was the malapportioned Plan 9-5-1 #1 used during the 1980s. Had the City chosen to use Plan 9-5-1 #1, it faced the very substantial likelihood of an injunctive challenge and postponement of the election, or later vacation of the election results. It therefore chose to file the counterclaim against the Hispanic citizens in the Section 2 action and obtain a declaration that Plan 9-5-1 #1 was unconstitutionally malapportioned, thus clearing the way for a court-ordered plan for use in the impending election. Under the circumstances, we cannot say that the course chosen by the City necessarily was either improper or taken in bad faith, nor did the

City's lawsuit prevent the Attorney General from proceeding to consider preclearance matters.

B

1

Under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, covered jurisdictions, such as the City of Houston, may implement changes in voting procedures in only two ways: (1) by obtaining a declaratory judgment from the United States District Court for the District of Columbia that the proposed change does not have the purpose or effect of abridging the right to vote on account of race; or (2) by submitting the proposed change to the Attorney General for preclearance. Challenges to an objection by the Attorney General may be heard only by the District Court for the District of Columbia. E.g., Perkins v. Matthews, 400 U.S. 379 (1971). However, Section 5's "preclearance requirements [do] not apply to plans prepared and adopted by a federal court to remedy a constitutional violation." McDaniel v. Sanchez, 452 U.S. 130, 138 (1981).

Section 5 states, in pertinent part, that "[a]ny action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 . . . ." 28 U.S.C. § 2284(a) provides:

> A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of

congressional districts or the apportionment of any statewide legislative body.

Because this is not an action challenging either a congressional apportionment scheme or a state-wide apportionment scheme, it falls within § 2284(a), thus requiring a three-judge court, only if the action is one "under" Section 5. Furthermore, we should note that a three-judge court convened under Section 5 is a court of limited jurisdiction and limited authority. In United States v. Board of Supervisors, 429 U.S. 642, 645 (1977), the Supreme Court held that "[a]ttempts to enforce changes that have not been subjected to [section 5] scrutiny may be enjoined by any three-judge district court in a suit brought by a voter . . . or by the Attorney General on behalf of the United States." "Enforcement" only includes the determinations whether a voting change is covered by Section 5, whether the preclearance requirements have been met and, if they have not, what remedy is appropriate. Id.

2

The City contends that its counterclaim is not an "action under" Section 5 because it did not challenge the merits of the Attorney General's objection to Plan 9-5-1 #2, and did not seek to have the district court order Plan 9-5-1 #2 to be used as the permanent plan for the 1990s. Each underlying point is correct. Because the City asked that the unprecleared Plan 9-5-1 #2 be used as an interim plan for the November 5 election, the City did not seek relief that necessarily would circumvent preclearance

-9-

requirements.  Instead, the City sought to alleviate the difficult situation it faced after the electorate had rejected the sixteen single-member district plan and the Attorney General had objected to Plan 9-5-1 #2.  Thus, we believe the question is not whether the district court's jurisdiction and the Attorney General's Section 5 responsibility are in conflict; rather, the question is under what conditions did the court have the authority to order an interim election, notwithstanding an unresolved Section 2 case and the absence of a precleared redistricting plan.

As the Attorney General acknowledges, the district court had the authority to order some form of emergency relief.  See Brief for the United States as Amicus Curiae, pp. 18-19 (district court had power to enjoin election pending preclearance of a new plan; to devise its own plan, correcting the objections raised by the Attorney General to the prior submission; or to adopt precleared Plan 9-5-1 #3); see also Upham v. Seamon, 456 U.S. 37 (1982).  To hold, as the plaintiffs urge, that the district court "lacked jurisdiction" to adopt--as only an interim measure--the plan to which the Attorney General had initially objected creates unacceptable tensions with the consistently-recognized discretion of the district court to formulate and authorize the implementation of interim election plans in voting rights cases.  See, e.g., McDaniel v. Sanchez, 452 U.S. 130 (1981); Connor v. Finch, 431 U.S. 407 (1977).  Such a holding is further objectionable because, illogically, it would make jurisdiction depend upon the relief

-10-

ultimately ordered by the court.  Courts cannot operate under such post hoc rules.

Second, although whether and why the Attorney General has objected to a certain plan are very relevant factors for the Section 2 court to consider, alone they cannot preclude the court from using that plan as an interim measure.  The Attorney General's objection or lack thereof does not necessarily indicate that the plan is constitutional or unconstitutional:  it simply means that the plan has not met the necessary procedural requirements.  Under appropriate circumstances, even an unconstitutional plan may be implemented on an interim basis.  Upham v. Seamon, 456 U.S. 37 (1982).  Moreover, as far as Section 5 is concerned, there is no distinction between a plan to which the Attorney General has objected and a plan that has not been submitted to the Attorney General at all:  in either case Section 5 has not been satisfied.  Thus, in deciding whether the court has authority to act, a determination cannot be rationalized on the basis of the Attorney General's filing or failure to file an objection.  The plaintiffs' jurisdictional argument thus stands in conflict with the scope of authority that Section 2 courts have traditionally possessed.

Third, in view of the decidedly limited jurisdiction of three-judge courts, it is unclear why a three-judge court can decide, as the plaintiffs suggest, what kind of interim relief is necessary during the pendency of a Section 2 action.  A three-judge court is required only to decide whether Section 5 applies, and if so,

whether it has been satisfied. Section 2 does not require three-judge courts when statewide apportionment schemes are not at issue, yet the plaintiffs' position would require their intervention in Section 2 cases on a wide scale.

Finally, the problems in a "jurisdictional" analysis of a Section 2 court's interim election order become apparent when one considers the daunting variety of procedural issues that might arise from interrelating single-judge and three-judge court functions. All of these reasons persuade us of the lack of merit of a jurisdictional objection to the City's counterclaim.

3

Notwithstanding that the district court had jurisdiction to grant interim relief, however, we conclude that on the facts of this case that it abused its discretion. After the Attorney General objected to Plan 9-5-1 #2, there were several alternatives available to the district court: (1) it could have enjoined the use of Plan 9-5-1 #1 and enjoined the election pending preclearance of a new plan; (2) it could have devised its own plan, perhaps responding to the objections raised by the Attorney General to Plan 9-5-1 #2; or (3) it could have ordered that the election be conducted under Plan 9-5-1 #3, which the Attorney General conditionally precleared at the last minute, and which the City supported. The district court offered weak reasons for refusing to order an election under the belatedly precleared Plan 9-5-1 #3 and thus for ignoring the Justice Department's role in the

redistricting process.  Contrary to the district court's proffered rationale, the Hispanic citizens' objection to Plan 9-5-1 #3 cannot have been significant, because they also objected to Plan 9-5-1 #2, which the court adopted.  That some changes in local voting procedures were necessary is likewise no reason to refuse Plan 9-5-1 #3, because the City agreed to that plan and urged its adoption notwithstanding such difficulties.  In short, the district court's preference for Plan 9-5-1 #2, instead of Plan 9-5-1 #3, apparently was guided more by *its* preference than by the significant factors of Justice Department conditional preclearance and City support for Plan 9-5-1 #3.  We cannot approve the district court's unsupported choice, given the available alternatives.

C

Our holding is narrow and fact-bound. We reiterate that a court-ordered reapportionment plan is not subject to the preclearance requirements of Section 5.  See McDaniel v. Sanchez, 452 U.S. at 138.  Further, elections may be held under exigent circumstances under a plan to which the Attorney General has objected.  See Clark v. Roemer, ___ U.S. ___, 111 S. Ct. 2096, 2102 (1991).  When, however, the district court does not fashion its own plan as an interim measure, and it rejects, without adequate reasons, a precleared plan in favor of a legislative plan that has not been precleared, it abuses its discretion in awarding interim relief.

III

The district court abused its discretion in awarding interim relief and, thus, we VACATE the October 12th order.  The parties have not requested that we set aside the November 5 election results.  This opinion should not be construed as having any such an effect, nor should it be construed as requiring the district court to order new elections under a different plan.  We REMAND the case for further proceedings as the district court deems necessary, which should not be inconsistent with this opinion.

VACATED and REMANDED.