812 F.2d 1494
 55 USLW 2543, 38 Ed. Law Rep. 61
 LEAGUE OF UNITED LATIN AMERICAN CITIZENS, COUNCIL NO. 4386,
and the Black Advisory Council, Organizations
Incorporated Under the Laws of the State
of Texas, Etc., Plaintiffs-Appellees,
v.
MIDLAND INDEPENDENT SCHOOL DISTRICT, Joseph Golding, Ronald
Britton, Joyce Sherrod, Joseph Reed, Fred Newman, Parker
Humes, Billy Jackson, All in Their Official Capacities,
Etc., Defendants-Appellants.
 Nos. 86-1710, 86-1775.
 United States Court of Appeals,
Fifth Circuit.
 March 27, 1987.
Rehearing En Banc Granted May 21, 1987.
 
 Patrick E. Higginbotham, Circuit Judge, filed a dissenting opinion.
 Cotton, Bledsoe, Tighe & Dawson, Charles Tighe, Rick Strange, Julia E. Vaughan, Midland, Tex., for defendants-appellants.
 Rolando L. Rios, San Antonio, Tex., for plaintiffs-appellees.
 Appeals from the United States District Court for the Western District of Texas.
 Before WISDOM, RUBIN and HIGGINBOTHAM, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This appeal concerns minority vote dilution.[1]
 
 
 2
 Blacks and Mexican-Americans in Midland, Texas, join hands in this class action to prevent their votes being diluted by an at-large system of voting in the election of trustees to the Board of Trustees for the Midland Independent School District (MISD)[2] An election system violates Sec. 2 of the Voting Rights Act of 1965, as amended, if members of a protected class have "less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of their class". 42 U.S.C. Sec. 1973(b). After the suit was filed, the parties agreed to the trial judge's order eliminating the at-large system. The defendants then submitted a "3-4 Plan", calling for the election of three members at-large and four from single-member districts. The plaintiffs objected to the 3-4 Plan. The district court found that the 3-4 Plan impermissibly diluted the plaintiffs' votes and ordered a seven single-member district plan, incorporating two districts the plaintiffs had proposed and allowing the defendants to draw the five remaining single-member districts. The defendants filed a Motion for Clarification and Reconsideration, and suggested a "5-2" Plan calling for three districts: the two single-member districts recommended by the plaintiffs and one district of five members elected at-large by the voters, predominantly Anglo, residing within that district. The trial judge summarily rejected the 5-2 Plan, reconsidered his original opinion, and again ordered that the MISD be divided into seven single-member districts. The defendants appealed. After oral argument on appeal to this Court, the United States Supreme Court rendered its decision in Thornburg v. Gingles, the first substantive Supreme Court interpretation of Sec. 2 of the Voting Act of 1965 as amended in 1982.[3] Because of that decision, we vacated the judgment of the district court and remanded the case for reconsideration. On remand, the parties augmented the record, the district judge reconsidered the case, and in an opinion closely keyed to the record adhered to his original judgment in favor of the 7-0 Plan.
 
 
 3
 We hold that the district court was not clearly erroneous,[4] and made no error of law. While the district court stated in its opinion that the decision was based on both constitutional and statutory grounds, it is clear that, if the plan does not conform to the Voting Rights Act, it must fail.
 
 
 4
 We therefore affirm basing our opinion solely on the Voting Rights Act.
 
 I. The Background
 
 5
 Based on his study of Texas statutes and the record, the trial judge concluded that Midland County had a long history of discrimination against minorities--both Black and Hispanic. Indeed, in 1975 this Court, after having ordered desegregation of schools in earlier litigation, directed the district court to take necessary steps "immediately ... to completely dismantle the dual system in the elementary grades".[5]
 
 
 6
 The population of Midland County is 113,600. The population of the MISD is 80,685: 12,238 (15.17 percent) Hispanics and 7,002 (8.68 percent) Blacks, for a combined minority population of 19,865 (24.62 percent). The student population of the MISD is 17,753: 4,507 (25.39 percent) Hispanics and 1,896 (10.68 percent) Blacks, for a combined minority student population of 6,403 (36.07 percent).
 
 
 7
 The district court found that both minorities were the victims of "oppressive discrimination" that has had "lingering effects on the election system", touching "the rights of Hispanics and Blacks to register, to vote, and to otherwise participate in the election process," presumably including elections to the School Board. Of the 113,000 persons living in Midland County 79,439 or 69.9 percent are of voting age. Mexican-Americans are 11.9 percent of the county's voting age population and Blacks make up 7.8 percent. Together, Mexican-Americans and Blacks constitute 19.7 percent of the total voting age population. As of April 1985, there were 49,658 persons (62.5 percent of the population) registered to vote in Midland County. Of the Mexican-American population, 38.1 percent are registered to vote compared with 65.8 percent of the remaining population. Of the 49,658 registered voters in the county, 3,614 or 7.3 percent are Mexican-Americans. There is an unregistered potential of 5,882 Mexican-Americans in the county. Only three persons that were Hispanic or Black have been elected to the Midland School Board. According to the 1980 census, a higher percentage of the minorities fall into a lower socio-economic status than whites. The record supports the district court's finding that both minorities lag behind whites in the areas of education, median family income, percent below the federal poverty line, housing overcrowding, value of housing, and employment.
 
 II. Gingles
 
 8
 A. The Gingles decision is important in many respects. Of first importance is its recognition of the intent of Congress, through the language and legislative history of the 1982 Amendment to Section 2 of the Voting Rights Act of 1965, that a voting violation may be proved "by showing discriminatory effect alone".[6] This amendment was the response of Congress to the plurality opinion in Mobile v. Bolden which, changing a formidable burden of proof to an intolerable burden,[7] had held that the Fifteenth Amendment guarantees the right to register and to vote, but does not protect against dilution; the Fourteenth Amendment protects against dilution only when it can be shown that the diluting mechanism was intended to have a racially discriminatory purpose.[8] Gingles, relying on the Voting Rights Act, as amended, established as the "relevant legal standard [for voting dilution] the 'results test' applied by White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 and by other federal courts before Bolden ".[9]
 
 
 9
 B. Gingles sets forth the criteria to be applied in determining whether there is a violation of Sec. 2 of the Act. The opinion quotes from the Senate Judiciary Committee majority Report the following "typical factors" of the "totality of circumstances" to be considered in applying the results test:
 
 
 10
 "1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 11
 "2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 12
 "3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 13
 "4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 14
 "5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 15
 "6. whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 16
 "7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
 
 
 17
 "Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
 
 
 18
 "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
 
 
 19
 "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard practice or procedure is tenuous."
 
 
 20
 S.Rep. 28-29.
 
 III. Trial Court and Gingles
 
 21
 The district judge examined each of the factors listed by the Senate Judiciary Committee and referred to by Justice Brennan as relevant in considering the totality of circumstances. Briefly stated, the trial court made the following findings. (1) The MISD has a history of past discrimination. (2) Voting for school trustees has been racially polarized. (3) At-large voting, the numbered place system, and the requirement that a candidate be elected by a majority vote have enhanced the opportunity for discrimination against the minority vote. (4) There was no proof that there ever was a slating process. (5) Although there are two minority groups in Midland, both have suffered the same adverse social and economic effects Justice Brennan described in discussing the black minority in Gingles. (6) There was no proof of overt or subtle racial appeals in political campaigns. (7) "Few minority candidates have dared to try to be elected." Since the adoption of the majority vote requirement, no minority member has been elected to the Board in a contested election against an Anglo.
 
 
 22
 Until 1974 candidates for the Board ran at-large and were elected by a plurality vote. Between 1964 and 1974, of 52 candidates bidding for 23 seats on the MISD six were minority candidates; three were elected. In 1974 the MISD instituted a numbered post (place) system and a majority rule requirement, both of which dilute minority voting. Between 1974 and 1984, of 47 candidates bidding for 19 seats on the Board, eight were minority candidates; one was elected, in 1977, in an uncontested race. An examination of voting patterns in individual elections led the trial court to the finding that "in each case in which a minority candidate ran for the MISD Board the voting has been polarized along racial lines". Considering the totality of circumstance, the district court concluded that in the past the votes of Blacks and Mexican-Americans had been diluted.
 
 
 23
 The defendants's proposed 3-4 Plan would elect four candidates from single-member districts and three at-large elected by numbered posts and with staggered terms. One district is made up of 76.42 per cent minority members; the remaining districts are predominantly Anglo. The proposal shows that the minorities constituted a sufficiently large and geographically compact group to elect at least one representative. As the trial judge pointed out, since the adoption of the majority vote requirement, not one minority member who had Anglo opposition has been elected a trustee of the MISD. The 5-2 Plan vests Anglo voters with the undeniable ability to elect five trustees. Placing two minority members in a special category would make it inherently difficult for them to act as full representatives of the community as a whole. Moreover, the vote at-large would be restricted to one district. The plan is not analogous to Caldron v. McGee in which two at-large representatives were elected by all the voters.[10]
 
 
 24
 The Supreme Court has repeatedly emphasized the importance of Rule 52(a), Federal Rules of Civil Procedure, which requires the fact findings of the district court to be upheld unless they are "clearly erroneous."[11] Certainly there was evidence from which the district judge might have reached contrary conclusions. But his findings of fact have abundant support in the record. They are therefore the only basis on which the correctness of his legal conclusions can be tested.
 
 IV. Bloc Voting
 
 25
 The defendants find fault with the district court principally because it considered Blacks and Hispanics as a minority group instead of considering them separately in applying the Gingles criteria. The Gingles discussion of polarized voting is the crux of this appeal. Gingles carefully developed the proposition that "while many of all of the factors listed in the Senate Report may be relevant to a claim of vote dilution ... a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically, insular minority group." (Emphasis in the original.) The bloc voting majority referred to was that of the whites in North Carolina. There is no doubt that minorities also engage in bloc voting and that a good candidate will bring out cross-over voting from members of both blocs, but in MISD the equivalent to the predominant bloc voting that concerned the court in Gingles is the Anglo bloc.[12]
 
 
 26
 The opinion states that three "circumstances are necessary preconditions for multi-member districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons".
 
 
 27
 (1) First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates.
 
 
 28
 (2) Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.
 
 
 29
 (3) Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances, such as the minority candidate running unopposed ... usually to defeat the minority's preferred candidate.... In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.
 
 
 30
 A. Is the minority group large enough to constitute a majority in a single-member district? The district court considered West Texas "unique to this part of the world" in having three reasonably definable ethnic groups.[13] Midland's population is 74.5 percent Anglo, 15.9 percent Hispanic, and 9.6 percent Black. The trial judge found that the evidence presented demonstrates that Blacks and Hispanics live predominantly in a geographically discrete area, residing predominantly in the eastern and southeastern portions of Midland. The "Racial Breakdown of 1985 City Voting Precincts by Census Tract, 1980 Census" demonstrates the actual population breakdown. The geographical area where Blacks and Hispanics in Midland live roughly correlates with the areas encompassed by census Precincts 1, 2, and 3. The Court noted that, of Midland's total Black population, 92.43 percent of that population live within one of these three precincts. With regard to Midland's Hispanic population, 73.7 percent of that total live within the same precincts. Significantly, only 7.6 percent of Midland's majority population live in this area. The actual ethnic breakdown of the population living in Precincts 1, 2, and 3 is as follows: 34 percent of the population is Black, 44 percent is Hispanic, and 22 percent is Anglo. Although the Black population in District 1 totals 45.81 percent, when combined with the 25.68 percent Hispanic population, the total minority representation constitutes 71.5 percent of the District's population. Thus, in actuality, that district is overwhelmingly populated by minorities.
 
 
 31
 Considering these statistics and the voting record referred to earlier in this opinion, we agree with the trial judge that the plaintiffs have met the first of Justice Brennan's requirements that there be a showing of a geographically compact group capable of carrying a district. Even if, however, we disagreed, we could not say that his conclusions lack support in the record or are clearly erroneous.
 
 
 32
 B. Are Blacks and Hispanics together a politically cohesive group? As directly faced in Gingles, the question was whether Blacks alone were a politically cohesive group. In MISD the issue is dual: (1) whether Blacks alone and Hispanics alone are such a group; and (2) whether together the groups are cohesive with each other. The district court answered both questions affirmatively. The principal attack is on the finding that Blacks and Hispanics would vote together in School Trustee elections.
 
 
 33
 There is no doubt that there are many cultural and ethnic differences between the two groups. Within the broad class of Hispanics (because their surnames may sound Spanish) there is a wide variance that includes descendants of Castilian nobility as well as descendents of Mexican ancestry who may be more Mayan or native Indian than Hispanic. To a somewhat similar extent there may be wide differences among Blacks. But the prejudice of the majority is not narrowly focused. The records in too many cases show that Anglos do discriminate against both Blacks and Mexican-Americans for anyone to deny that these two groups may ever be aggregated in a voting dilution case.
 
 
 34
 Here an experienced trial judge, familiar with local conditions, found as a fact that in Midland, Texas, the two groups "share[d] common experiences in past discriminatory practices". He also found: "the two groups have political goals that are inseparable. As such, coalition formation will often prove to be mutually beneficial to the two groups. The evidence presented bears out this fact. Testimony presented showed that Blacks and Hispanics worked together and formed coalitions when their goals were compatible." The bringing of this lawsuit by Blacks and Hispanics is symbolic of their realization that, at least in Midland, Texas, they have common social, economic, and political interests which converge and make them a cohesive political group.
 
 
 35
 The defendants argued that Blacks and Hispanics in Midland, Texas, are not politically cohesive, and offered in support of their argument a survey, conducted by the University of Texas, of the attitudes of Midland residents vis-a-vis the MISD. The survey concluded that Blacks and Hispanics have mutually exclusive interests and that the two groups are politically distinct. But the survey does not prove that the two minority groups would vote differently in any particular election in which a member of one of their groups is a candidate against an Anglo, or whether one of either minority groups has a chance to win against an Anglo. The expert who conducted the survey thought that attitudes toward MISD influenced voting patterns. Doubtless they do. But those attitudes are not decisive, particularly when other loyalties are awakened. Allegiances against a common enemy by nations or groups otherwise dissimilar are frequent both in history and in current events. The district court was "unpersuaded" by the survey. So are we.
 
 
 36
 The plaintiffs offered an expert, Dr. Robert Brischetto, who had analyzed elections for the last eight years in Midland.[14] He used the same statistical methods used by the plaintiffs' expert in Gingles. He concluded that in Midland School Board elections minorities and non-minorities voted along racial lines; Anglos voted for Anglo candidates. While the trial judge did not refer to this expert's testimony in his opinion after remand of the case, he found that the two minority groups were politically cohesive. He expressly considered in depth election results over many years, some of which have been referred to in this opinion and, to some extent, he relied on the following chart showing the "equity of representation" of minorities on the MISD Board:The record supports his cohesiveness finding. Certainly we cannot see clear error in it.
 
 
 37
 C. Bloc voting by the majority.
 
 
 38
 While in Gingles the minority group had a single distinguishing characteristic, it is clear from the opinion that the question is not whether Blacks as Blacks can produce enough votes to elect a Black to the Board of MISD or whether Hispanics, as Hispanics, can produce enough votes to elect an Hispanic. The crucial question is whether in Midland, Texas, Anglos, voting as a bloc for an Anglo, will usually defeat a minority candidate for School Trustee, whether he be a Black or Hispanic.
 
 
 39
 Justice Brennan observed: "As must be apparent, the degree of racial bloc voting that is cognizable as an element of a Sec. 2 vote dilution claim will vary according to a variety of factual circumstances. Consequently, there is no simple doctrinal test for the existence of legally significant racial bloc voting. ..." A member of a minority group may occasionally be elected to a political office, but one would be politically naive not to recognize in some such situations the tactical advantages in a political campaign of a white majority supporting one or more minority candidates. The election, therefore, of one or of a few minority candidates is not necessarily significant in a political election dominated by white voters.
 
 
 40
 Not much more therefore need be said concerning the third prong of the Gingles test, that the bloc voting of the majority was in fact able to defeat the minorities' candidates. The Anglo bloc voting in Midland was successful, as is apparent from the previous discussion.
 
 V. Caveats
 
 41
 A. The district court held that, in addition to violating the Voting Rights Act, the defendants' 3-4 Plan and 5-2 plan "do not meet constitutional muster". We find it unnecessary to discuss constitutionality. The repudiated system of at-large voting in the MISD and the defendants' proposed plans do not meet the requirements of Sec. 2 of the Voting Rights Act.
 
 
 42
 B. We do not hold that all at-large voting plans violate Sec. 2 of the Act or that plans combining an at-large multiple-member district with single-member districts violate the Act. We restrict our holding to the showing of voting dilution in Midland, Texas. We are mindful, however, as was the district court, that no minority group is entitled to proportional representation; the 1982 Amendment to Sec. 2 specifically prohibits it.
 
 
 43
 C. Section 23.024(b) of the Texas Education Code provides that "[t]he board of trustees of a school district, on its own motion, may order that trustees of the district are to be elected from single member districts or that not fewer than 70 percent of the members ... are to be elected from single member trustee districts." (Emphasis added.). This statute prohibits the MISD Board from adopting its 3-4 Plan or its 5-2 Plan.[15]
 
 
 44
 The district court treated the statute as irrelevant, relying on McDaniel v. Sanchez.[16] That case held, at 152-53, that the Voting Rights Act and its preclearance requirements are applicable to a proposed plan without a showing that a legislative body has the authority to enact a plan in issue.
 
 
 45
 The fact that particular requirements of state law may not be satisfied before a plan is proposed to a federal court does not alter this essential characteristic. The applicability of Sec. 5 to specific remedial plans is a matter of federal law that federal courts should determine pursuant to a uniform federal rule.
 
 
 46
 The case before us does not deal with the preclearance section of the Act. We are concerned only with voting dilution under Sec. 2 and with a federal court-ordered plan of election. We assume that should there be a choice between two constitutional voting plans which do not violate Sec. 2 of the Act, the district court would give appropriate deference to the state legislative body's choice.
 
 
 47
 * * *
 
 
 48
 In sum, we hold that the district court was not clearly erroneous in its findings and committed no material error of law. We therefore affirm its approval of the 7-0 Plan for the election of trustees to the Board of Trustees for the Midland Independent School District from single-member districts.
 
 
 49
 PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:
 
 
 50
 This case is not the usual attack upon an at-large district. Rather it is an appeal from the district court's rejection of the school board's submission of two successive plans, which followed the board's decision during this suit to abandon an at-large system. First, the board submitted a "3-4" plan in which three school board trustees would be elected at-large and four would be elected from single-member districts. The district court rejected this plan in favor of all single-member districts. The board then proposed a "5-2" plan with 5 members elected at-large from most of the district and 2 members elected from single-member districts located in minority neighborhoods. The district court also rejected the 5-2 plan, erroneously treating black and hispanic voters as a cohesive voting unit. I am persuaded that the district court's finding that blacks and hispanics were a single politically cohesive minority under Thornburg v. Gingles, --- U.S. ----, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) is clearly erroneous. I dissent.
 
 
 51
 * A
 
 
 52
 In the Voting Rights Act Amendments of 1982, Congress rejected intent as an element of a violation in favor of an "effects" or "results" test. At the same time, Congress provided, as a political compromise, that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. Sec. 1973(b). The compromise did little more than sidestep the divisive issue, leaving to the courts the task of developing a principled way to distinguish illegal vote dilution from lost races; and to do so without depending so heavily upon the degree of minority success in elections that we make proportional representation--if not in name, in fact--the true rule. The efforts of the Gingles court to identify such a principle produced a 5-4 split along a line that, in substantial part, parallels the line between effects and proportional representation.
 
 
 53
 Justice Brennan's opinion in Gingles requires three proofs to establish that a multimember district dilutes a minority's vote: A minority group must demonstrate (1) that it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that it is politically cohesive; and (3) that the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. 106 S.Ct. at 2766-67.
 
 
 54
 In a section without majority support, Justice Brennan's opinion also rejects the argument that proof of racially polarized voting requires proof of a causal relationship between race and voting, concluding that "only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters," id. at 2773; relatedly, that it is the "status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important," id. at 2776 (emphasis in original).
 
 
 55
 Significantly, and critically, it was here that Justice White left Justice Brennan's opinion, explaining that Justice Brennan's conclusion that the "crucial factor in identifying polarized voting is the race of the voter and that the race of the candidate is irrelevant ... is interest-group politics rather than a rule hedging against racial discrimination." Id. at 2783-84. The key component in cohesion is the presence of bloc voting. Consequently, the Court's opinion, sans agreement on the definition of bloc voting presents a troubled construct, inviting inferior courts through its uncertainty to blur distinctions between ephemeral political coalitions and cohesive racial minorities, thereby confusing losing votes with "diluted" votes. The district court and the panel majority accepted the invitation.
 
 B
 
 56
 Concluding on this record that blacks and hispanics are sufficiently cohesive to be counted as a single minority in the Gingles inquiry risks that ephemeral political alliances having little or no necessary connection to discrimination will be confused with cohesive political units joined by a common disability of chronic bigotry. Stated more directly, the determination that disparate minority groups are cohesive must be consistent with the purpose of the Act to provide racial and ethnic minorities the vote that they would have in the absence of forbidden discrimination.
 
 
 57
 The purpose of the Act is to redress racial or ethnic discrimination which manifests itself in voting patterns or electoral structures. The tie to race or national origin in Justice Brennan's opinion in Gingles is the raw correspondence in votes and outcome. Its three step inquiry assumes a group unified by race or national origin and asks if it is cohesive in its voting. If a minority group lacks a common race or ethnicity, cohesion must rely principally on shared values, socio-economic factors, and coalition formation, making the group almost indistinguishable from political minorities as opposed to racial minorities. At the least, concluding that a political group lacking the cementing and predictive force of common race or national origin is nonetheless politically cohesive under Gingles is a difficult undertaking with significant risks. The risks include the reality that diluting the requirement of cohesion expands the mission of the Act beyond the treatment of present-day manifestations of chronic bigotry to a more general device for accommodating majority government and plural constituents--thereby revealing a distrust of the ability of our republican government to do so. I turn now to the record to determine the extent to which my fears have here been realized.
 
 II
 
 58
 The district court first concluded that blacks and hispanics were sufficiently large and geographically compact to constitute a majority in a single-member district. It found that blacks and hispanics live predominately in the eastern and southeastern portions of Midland, an area that "roughly correlates with the areas encompassed by City Precincts 1, 2 and 3." The district court noted that 92.43% of the black population of Midland and 73.7% of the hispanics live in the area with "only 7.6%" of the whites. But describing the makeup of this area as percentages of the entire Midland population is not necessarily a description of ethnic insularity. The undisputed facts are that this area is fairly well integrated and the minorities are dispersed throughout. The ethnic distribution in the general population of the area is 44% hispanic, 34% black, and 22% white--and even this fails to describe accurately the ethnic distribution of eligible voters.
 
 
 59
 Defendant's expert testified without contradiction that the percentage of voters in the population varies among blacks, hispanics and whites, but must approach 65% to constitute a political majority. Under the district's proposed 3-4 plan, hispanics would have had one safe district. But it is doubtful that blacks alone could acquire the necessary 65% to constitute a majority in any one district. Thus, blacks alone could not successfully attack an at-large system and certainly not the district's proposed 3-4 plan, which the same minority leaders accepted for Midland's city government. It is then no accident, and hardly determinative of political cohesion, that blacks did not bring this suit alone; it certainly does not substitute for evidence of cohesive voting.
 
 
 60
 Under the ordered 7-0 plan, most blacks are concentrated in District 1; yet they constitute only 45.81% of its total population. Accordingly, the district court combined blacks and hispanics to meet Gingles' required political majority. Despite its novelty and significance, the district court's sole justification for the combined minority unit was that it would be unjust to do otherwise:
 
 
 61
 Should the Plaintiffs fail to prove that the minorities cannot form coalitions, this would go to the query presented by prong two. Thus, to not allow an aggregation for the satisfaction of prong one would be inherently unjust. Therefore, from the evidence presented, appellees did satisfy prong one of the Gingles test.
 
 
 62
 The district court then turned to the question whether the "group is politically cohesive." It concluded that while the groups may not
 
 
 63
 always have the same political goals, it is clear that the two groups have political goals that are inseparable. As such, coalition formation will often prove to be mutually beneficial to the two groups.
 
 
 64
 In short, the district court did not, by its conclusion that blacks and hispanics were a cohesive political force, find anything more than that they occasionally join their political hands. There is no record evidence to support a finding of any greater nexus; indeed the record evidence is to the contrary.
 
 
 65
 In the original trial of this case, and before Gingles focused the court and the parties upon causation by asking whether a minority had the votes for election of a single-member district, the district court explicitly found that blacks and hispanics were not a cohesive unit. In rejecting the proposed 3-4 plan, before Gingles, the district court explained:
 
 
 66
 Should the "3-4 plan" be placed in effect by this Court, it is certain that the minority population of the MISD would be able to elect but one representative. While the Defendants' proposed District 2 contains a large percentage of minority group members, it cannot be said that all of the minorities residing in the proposed District 2 are homogeneous. On the contrary, while perhaps Blacks and Mexican Americans share common experiences in past discrimination practices of the majority, the two groups have distinct cultures and decidedly different political goals.
 
 
 67
 (emphasis supplied). After Gingles and a two-hour hearing on remand,[1] the district court reached the opposite conclusion. The sole basis for its new conclusion that blacks and hispanics were a cohesive political body was their occasional coalitions, including the prosecution of this suit. The district court simply concluded that this was sufficient under Gingles to allow aggregation. The district court did not, and could not on this record, find that blacks and hispanics were cohesive in any other sense. The reality is that how much of a coalition, as distinguished from cohesion, actually exists is itself seriously at issue.
 
 
 68
 The district court pointed to low income and poor education as common and tying concerns of blacks and hispanics, ignoring the fact that 22% of the population of this same part of Midland is white with similar socio-economic characteristics. This is not to say that poor whites are similarly situated in every relevant way; in the view of the Voting Rights Act they cannot be, freed as they are from the disabilities of discrimination due to race and, presumably, national origin. Our decision accepts, as Congress has accepted, that the headwind of chronic bigotry has slowed both blacks and hispanics in the economic race, but it does not follow that any resulting common political agenda--seen broadly--gives them political cohesion.[2] Such evidence as there was pointed in the opposite direction.
 
 
 69
 The board offered a study conducted by the University of Texas reflecting the attitude of Midland residents toward the policies of the school board. The study demonstrated that hispanics and blacks had significantly different views regarding Midland schools. Nevertheless, the district court found that the study was not relevant "to predict voting behavior ... or how cohesive people will be," that voter attitudes were not relevant to how people vote--a rather startling proposition. While it should be no surprise to one who has read the survey, after the court announced its 7-0 plan with the two safe coalition seats, a hispanic candidate promptly filed against black candidates in District 1--the predominately black district--a curious exercise in coalition politics indeed. Moreover, Dr. Taebel, the only expert who testified on remand after Gingles and whose opinion was left virtually unchallenged by other expert testimony, was asked whether in his study of the Midland Independent School District he had seen any operating coalition between blacks and hispanics. He replied that "I have seen none whatsoever."
 
 
 70
 In any event, this newly minted minority must also meet the third step in Gingles; it "must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances ... usually to defeat the minority's preferred candidate." Gingles, 106 S.Ct. at 2767 (citations omitted). Regarding possible white bloc voting to defeat the minority's candidates, Taebel pointed out that in all elections since 1978, the candidate preferred by the minorities was elected eleven of fifteen times for a success rate of 73.78%. The evidence to which the district judge pointed, and his candid basis for refusing throughout this case to consider anything but a 7-0 plan, was a perception that the school district would be best served by a greater number of black and hispanic board members.
 
 
 71
 In finding that blacks and hispanics in the Midland Independent School District are a cohesive group under Gingles, the district court ignored historical and cultural differences between blacks and hispanics and lacked record support that in Midland the two were politically cohesive; as it relaxed the measure of cohesion to accommodate such differences, the district court increased the risk of frustrating congressional will. On this record, his order draws upon a vision of "safe" districts that is unacceptably close to proportional representation.
 
 III
 
 72
 The point is not that there were no coalitions. There doubtlessly were from time to time. Rather, the point is that sustaining the district court's findings that blacks and hispanics are a single cohesive minority under Gingles has consequences far beyond Midland, Texas, because it reads cohesion in a way the Gingles court, and Congress, could not have intended. The error of the district court, perpetuated by the panel majority, is that it abrades the requisite moorings to race or national origin. Without such ties, we are about judicial superintendence of election outcomes in the name of protecting those less able to fend for themselves in the political arena, when inability is indistinguished from political loss.
 
 
 73
 In short, from conflicting signals from Congress, the Supreme Court in Gingles attempted to derive an administrable measure for determining whether an election practice or voting pattern is illegally correlated with race or national origin. Under the Court's formulation, the requirement of minority cohesion and correlation of voting behavior with race or national origin are critically in tandem, such that dilution of one requirement dilutes the other. Attenuating the test for cohesion and correspondingly, the correlation with race and national origin, drains the district court's "enforcement" of the Voting Rights Act of statutory authority and constitutional support. In the last measure, the judgment becomes no more than a judicial sense that its result is more "just" than the challenged plans. I had supposed that the essence of our republican arrangement is that voting minorities lose; that, absent participation inhibited by racial or ethnic discrimination, Congress and the courts lack authority to further regulate.[3]
 
 IV
 
 74
 Even though the board's 3-4 plan complies with the Voting Rights Act, the question remains whether the district court is free to reject the plan instead of according it the deference courts owe legislative judgments.
 
 
 75
 * Our jurisprudence makes plain that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." Chapman v. Meier, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975) (citations omitted). Thus, a federal district court should follow the preferences of the State as expressed in reapportionment plans, unless adherence to the preferences violates the Constitution or federal statutory law. See Upham v. Seamon, 456 U.S. 37, 41, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982). Most relevant to this case, "the fact that the reapportionment plan ... was devised in response to an order of a federal court does not change its character as a legislative plan." McDaniel v. Sanchez, 452 U.S. 130, 146, 101 S.Ct. 2224, 2234, 68 L.Ed.2d 724 (1981).
 
 B
 
 76
 Plaintiffs argue that the board lacked authority under state law to propose a 3-4 plan and that the plan should therefore be denied the deference normally accorded legislative plans. However, I am persuaded that the board did have authority to propose this plan in response to a court order, and that the court should defer to the board's judgment.
 
 
 77
 Section 23.024(b) of the Texas Education Code provides that "[t]he Board of Trustees of a school district, on its own motion, may order that trustees of the district are to be elected from single-member districts or that not fewer than 70 percent of the members of the board of trustees are to be elected from single-member trustee districts" (emphasis supplied). The MISD's proposed plans were not in an "order" adopted on the legislative body's "own motion." Rather, they were proposals or judgments proffered in response to the suit. Thus, the proposals retain their legislative character because they reflect the "policy choices" of the elected representatives of the district, Wise v. Lipscomb, 437 U.S. 535, 548, 98 S.Ct. 2493, 2501, 57 L.Ed.2d 411 (1978), and therefore merit deference as legislative plans, McDaniel, 452 U.S. at 152, 101 S.Ct. at 2237-38. Because they are proposals and not self-adopted orders, however, they do not violate Tex.Educ.Code Sec. 23.024(b). Thus, the 3-4 and 5-2 plans were legislative plans, worthy of due deference.
 
 
 78
 Admittedly, one might object that this reading of "on its own motion" enables a school district to escape the will of the Texas State legislature by hiding behind a federal remedy. The reality is that the freedom of a school board exists only when it submits a proposal to a federal court in an attack upon its voting system. That the state legislature limited the power of independent school districts to carve its districts, "on its own," does not mean that it intended to limit its ability to respond to a federal order. On the other hand, and it gives me substantial pause, the statute can be read as expressing the state's fear of local gerrymanders by its preference for either at-large or single-member districts. At the same time, the language arguably is only an intended distinction between board initiated and voter initiated change. Absent a violation of the Voting Rights Act or the Constitution, the ordering of the voting is the state's business. Our task then is to follow state policy and while not free of doubt, I am persuaded that Texas did not intend to so limit school boards in their defense of voter right suits.
 
 V
 
 79
 Even were the majority correct in determining that the proposed plans violate either the Voting Rights Act or the Texas Education Code, it does not follow that the remedy the district court imposed should be affirmed. The court must still consider the effect of its decision on the "Agreed Order" dated October 10, 1985, in which the board stated it was "willing for a change to be made in the election method for school board members" and proposed the 3-4 plan.
 
 
 80
 The agreement contemplated that the 3-4 plan would be implemented if found to comply with the Voting Rights Act. The agreement does not indicate what should happen if the district court finds that the 3-4 plan violates the Act or if the court refuses to enter the plan as a federal remedy, even if it satisfies the Act. Conceivably, the district board may have preferred to defend the at-large election system in that case. We should remand for the district court to determine whether the board had conceded that the at-large election system violated the Act, or whether the willingness to change was conditioned on the court's acceptance of the 3-4 proposal.[4]VI
 
 
 81
 In sum, I dissent from the majority's determination that the district court properly applied the Voting Rights Act and Gingles, especially in light of the failure of the evidence to establish cohesion of hispanic and black voters, as I would read cohesion. Having concluded that the school board's agreement to institute a 3-4 or 5-2 plan is ambiguous and possibly invalid under the majority's reasoning, I would remand this case for resolution of the meaning and continued vitality of the Agreed Order.
 
 
 
 [1]
 No standard of the concept "vote dilution" has been advanced in the existing literature on the subject. Chandler Davidson, an acknowledged authority in the field, used as an expert in over a dozen lawsuits, including Bolden v. City of Mobile, 423 F.Supp. 384 (S.D.Ala.1976), defines vote dilution as "[A] process whereby election laws or practices, either singularly or in concert, combine with systematic bloc voting among an identifiable group to diminish the voting strength of at least one other group". (Emphasis added.) Davidson, Minority Vote Dilution: An Overview, in Minority Vote Dilution 4 (C. Davidson ed. 1984). He discusses the frequency of these dilutionary practices in the South and Southwest, "the areas of the country with the highest proportion of Blacks and Hispanics, respectively". Id. at 10
 
 
 [2]
 The plaintiffs are the League of United Latin American Citizens (and all its members), the Mexican American Legal Defense in Education Fund, the Black Advisory Council (and all its members), the Southwest Voter Registration Education Project, and various individuals, some of them attorneys representing the plaintiff organizations. The defendants are the Midland Independent School District and the individual trustees of MISD
 The action was instituted under 42 U.S.C. Secs. 1971, 1973, 1983, and 1988, to redress the denial, under color of state laws, of voting rights secured under the Fourteenth and Fifteenth Amendments.
 
 
 [3]
 Thornburg v. Gingles, --- U.S. ----, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)
 
 
 [4]
 Rogers v. Lodge, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); Jones v. City of Lubbock, 727 F.2d 364, 371 (5th Cir.1984)
 
 
 [5]
 United States v. Midland Independent School District, 519 F.2d 60, 64 (5th Cir.1975)
 
 
 [6]
 106 S.Ct. at 2759
 Section 2, as amended, 96 Stat. 134, reads as follows:
 "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
 "(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Codified at 42 U.S.C. Sec. 1973.
 
 
 [7]
 The plurality (in Mobile v. Bolden ) recast White v. Regester into a case involving purposeful racial discrimination and announced that the intent requirement of Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), controlled the construction of the equal protection clause even in a vote-dilution case. Thus, the plurality concluded that Blacks in Mobile were not entitled to relief unless they demonstrated that the at-large system had been adopted or maintained for discriminatory purposes. In [The 1982 Amendment], a legislative victory as monumental as it was surprising, supporters of minority voting rights convinced Congress to renew the basic remedies of the Act and to amend the Act to provide statutory protection in the context of minority vote dilution that is in large part equivalent, and in some ways superior, to the discriminatory-impact approach of White v. Regester and Zimmer v. McKeithen. Frickey, Majority Rule, Minority Rights, and the Right to Vote. Reflections Upon a Reading of Minority Vote Dilution, 3 Law & Inequality, 209, 214 (1985)
 
 
 [8]
 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980)
 
 
 [9]
 Footnote 4 in Gingles, 106 S.Ct. at 2759 states:
 These factors were derived from the analytical framework of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in Zimmer v. McKeithen, 485 F.2d 1297 (1973), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam ), S.Rep. 28, n. 113.
 See also footnotes 7, 8, and 9, 106 S.Ct. at 2763.
 
 
 [10]
 Calderon v. McGee, 584 F.2d 66 (5th Cir.1978)
 
 
 [11]
 In Gingles, 106 S.Ct. at 2781, Justice Brennan wrote:
 We reaffirm our view that the clearly-erroneous test of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution.... "This determination is peculiarly dependent upon the facts of each case," Rogers [v. Lodge ] supra, 458 U.S. at 621, 102 S.Ct. [3272] at 3277 [73 L.Ed.2d 1012 (1982) ], quoting Nevett v. Sides, 571 F.2d 209, 224 (CA5 1978), and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms. 458 U.S. at 622, 102 S.Ct. at 3278. The fact that amended Sec. 2 and its legislative history provide legal standards which a court must apply to the facts in order to determine whether Sec. 2 has been violated does not alter the standard of review.... [T]he application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law.
 
 
 [12]
 In Gingles at 2769 Justice Brennan wrote:
 "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." Gingles, 2769.
 
 
 [13]
 "The situation of Mexican Americans in the Southwest is comparable to that of blacks in the South. They have historically been the victims of violence, state-sanctioned segregation in schools and housing. Jim Crow practices, and job discrimination. Today they are still widely excluded from effective political participation. Of all persons who served as members of Texas city councils from 1968 to 1978, less than 6 percent were Mexican Americans, although Texas had a Spanish-origin population of 21 percent in 1980. In South Texas, where Mexican Americans comprise a majority of the population, 31.7 percent of city council members during this period belonged to that ethnic group. In reporting these figures, the Texas Advisory Committee to the U.S. Commission on Civil Rights remarked 'It is significant ... that even today 179 (83.6 percent) of the 214 larger cities in Texas have at-large elections for city council.' " Davidson, Minority Vote Dilution, An Overview, in Minority Vote Dilution (C. Davidson ed. 1984)
 
 
 [14]
 In Jones v. Lubbock, 730 F.2d 233 (5th Cir.1984) Judge Higginbotham criticized statistical evidence prepared by the same expert witness, Dr. Brischetto, for testing only the correlation of race to the election. There are as any informed person knows, other pertinent variables, such as campaign expenditures, party identification, income, media advertising, religion, name recognition, position on key issues, acceptance of a "moderate" black or Hispanic by whites, and so on. See Lee County Branch of NAACP v. City of Opelika, 748 F.2d 1473, 1482 (11th Cir.1984). But in this case the defendants failed to present evidence on these other variables. The record clearly supports the trial judge's finding of voting dilution correlated with ethnic discrimination. Multivariate regression analysis is open-ended and confusing. The Supreme Court affirmed a finding of polarized voting based on a bivariate regression analysis such as Dr. Brischetto used in this case. Mississippi Republican Executive Committee v. Brooks, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984)
 ----------------------------------------------------------
Year percent of percent of Minority Equity
 Representation of of School Population Measure
 Minorities on
 School Board
1964 0 percent 21 percent -21 percent
1965 0 percent 21 percent -21 percent
1966 0 percent 21 percent -21 percent
1967 0 percent 21 percent -21 percent
1968 0 percent 21 percent -21 percent
1969 0 percent 21 percent -21 percent
1970 14 percent 21 percent - 7 percent
1971 14 percent 21 percent - 7 percent
1972 14 percent 21 percent - 7 percent
1973 14 percent 21 percent - 7 percent
1974 28 percent 21 percent k 7 percent
1975 14 percent 25 percent -11 percent
1976 14 percent 25 percent -11 percent
1977 14 percent 25 percent -11 percent
1978 14 percent 25 percent -11 percent
1979 14 percent 25 percent -11 percent
1980 0 percent 25 percent -25 percent
1981 0 percent 25 percent -25 percent
1982 0 percent 25 percent -25 percent
1983 0 percent 25 percent -25 percent
1984 0 percent 25 percent -25 percent
 
 
 [15]
 The 3-4 Plan violates Texas laws in that it would result in the election of only 57 percent of trustees from single member districts. The 5-3 Plan would result in the election of only 29 percent from single districts
 The Texas law is relevant to show that state legislative policy strongly favored single-member district voting as far more important than at-large voting in any combination plan. In this case the Texas law is also relevant to show the extent to which the MISD would go to avoid using single-member districts.
 
 
 [16]
 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981)
 
 
 [1]
 The plaintiffs' case on remand occupies eleven pages of transcript
 
 
 [2]
 Compare the findings of the district court here with the observation of Justice Stevens that:
 In the line-drawing process, racial, religious, ethnic, and economic gerrymanders are all species of political gerrymanders.
 From the standpoint of the groups of voters that are affected by the line-drawing process, it is also important to recognize that it is the group's interest in gaining or maintaining political power that is at stake. The mere fact that a number of citizens share a common ethnic, racial, or religious background does not create the need for protection against gerrymandering. It is only when their common interests are strong enough to be manifested in political action that the need arises. For the political strength of a group is not a function of its ethnic, racial, or religious composition; rather it is a function of numbers--specifically the number of persons who will vote in the same way." Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (concurring in judgment). See Cousins v. City Council of City of Chicago, 466 F.2d 830, 851-852 (7th Cir.) (Stevens, J., dissenting), cert. denied, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151 (1972).
 
 
 [3]
 It is true that Congress could have required lesser proof. In theory at least, Congress could have so relaxed the proof that a putative minority need prove only that it was not represented according to its number, presuming that such underrepresentation had a sufficiently high likelihood of being tied to the illegality that its proscription was warranted. I do not pause to treat the difficulties posed by a statutory command of proportional representation. See Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Congress did not do so; perhaps because proportional representation as a measure of due strength will not do, but rather is itself a political alien, antithetical to our basic devotion to republican government. Concern for accommodation of factions has seldom been far away when debate about government implicates basic values. See The Federalist No. 10 (J. Madison); F. McDonald, Novas Ordo Seclorum: The Intellectual Origins of the Constitution 162-64 (1985). I emphasize that Justice Brennan's construct, as it shifts from race as a causative force, moves toward a theory of group rights and away from a theory of individual voting rights; it is a specie of gerrymandering--sans the equal protection requirement of intent. Relatedly, given the uncertainty of the Gingles court, it is not surprising that the issue of bloc voting was not resolved. It cannot be, absent agreement regarding the fundamental role of race in the enforcement of the Voting Rights Act
 
 
 [4]
 An additional problem is, in light of the majority's statement that the board lacked authority to propose a 3-4 plan, whether the agreed order that is so heavily based on that proposal is itself void for want of authority