Alonzo GONZALEZ, Jacinto Roy Mendoza, Juan Oliverez, Gilberto C. Padilla, Michael P. Romero, Jose Rosillo, Jose Angel Velasquez, and Ana L. Ventura, Plaintiffs,

v.

MONTEREY COUNTY, CALIFORNIA, Defendant.

Jackie CRAGHEAD, Kenneth K. Nishi, City of Seaside, California, and City of Marina, California, Plaintiffs in Intervention,

v.

MONTEREY COUNTY, CALIFORNIA, Defendant.

Donald Dunsford, Charmaine Cruchett, Barbara Nelson [individually and on Behalf of] Monterey County Committee for Fair Representation, Plaintiffs in Intervention.

No. C91–20736–WAI.

United States District Court, N.D. California.

Dec. 8, 1992.

Joanquin G. Avila, Milpitas, CA, Barbara Y. Phillips, San Francisco, CA, for plaintiffs Alonzo Gonzalez, Jacinto Roy Mendoza, Juan Oliverez, Gilberto C. Padilla, Michael P. Romero, Jose Rosillo, Jose Angel Velasquez and Ana L. Ventura.

John E. McDermott, Cadwalader, Wickersham & Taft, Los Angeles, CA, Elaine M. Cass, City Atty., Seaside, CA, for intervenors Jackie Craghead, Kenneth K. Nishi, City of Seaside and City of Marina.

William B. Daniels, Heisler, Stewart and Daniels, Inc., Monterey, CA, for intervenors Donald Dunsford, Charmaine Cruchett and Barbara Nelson [individually and on behalf of] Monterey County Committee for Fair Representation.

Lee L. Blackman, Daniel Grunfeld, McDermott, Will & Emery, Los Angeles, CA, for defendant County of Monterey.

## MEMORANDUM OF DECISION

INGRAM, District Judge.

Plaintiffs, members of defendant Monterey County's Hispanic community, commenced this litigation to challenge the County's apportionment of its supervisorial districts under the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c (West 1981), and the Fourteenth and Fifteenth Amendments to the United States Constitution, thereby giving the court federal question jurisdiction.

Plaintiffs now move to prevent the court from considering two redistricting plans presented by other parties to this litigation (the "H4" and "H5" plans). Plaintiffs premise their motion on the proposition that this court's consideration of the H4 and H5 plans would violate Section 5 of the Voting Rights Act. Plaintiffs move for the temporary installation of the redistricting plan proposed by plaintiff's counsel, Joaquin Avila, Esq., (the "Avila Plan"). (Pls.' Ex. 30).

## I. SUMMARY OF ISSUES

This matter presents two questions for the court's determination. The first is whether a legislature's endorsement of a litigant's redistricting plan creates a substantial question under Section 5 of the Voting Rights Act. The second is under what circumstances should a court, which has the authority to order a temporary redistricting plan, allow a legislature additional time to formulate a qualified plan of its own.

For the reasons stated below, the court rules in the affirmative as to the first question. As to the second, the court rules that where a legislature has not had an adequate opportunity to consider factors the court deems significant, the court should grant the legislature a limited opportunity to do so.

## II. STATEMENT OF FACTS

Defendant Monterey County is a political subdivision organized pursuant to the laws of the State of California (the "County"). A five-member Board of Supervisors governs the County. Cal.Gov't Code § 25000. On September 8, 1981, the Board of Supervisors adopted Ordinance No. 2773 which adjusted the County's supervisorial districts based upon the 1980 Federal Decennial Census.

In 1990, the United States conducted a decennial census. California law requires the County to adjust its supervisorial districts before November 1 of each year after

the year the United States conducts its decennial census. Cal.Elec.Code § 35101. Accordingly, on October 29, 1991, after several months of public meetings and hearings, the Board of Supervisors adopted Ordinance No. 3578, which adjusted the County's supervisorial districts. (Def. Mem.Supp. Dismiss at Ex. A). The Board of Supervisors amended Ordinance No. 3578 with its November 19, 1991 adoption of Ordinance No. 3580 (the "November 19, 1991 Plan"). (*Id.* at Ex. B). The Board scheduled the November 19, 1991 Plan to take effect on January 1, 1992, or upon the United States Department of Justice's approval, whichever occurred last. (Def. Mem.Supp. Dismiss at Ex. B, § 2).

On December 9, 1991, the County submitted the November 19, 1991 plan to the Department of Justice for preclearance review pursuant to Section 5 of the Voting Rights Act. (Def.Mem.Opp.Temp.Crt. Ordered Redistricting Plan at 6). Upon receipt of the County's November 19, 1991 plan, the Department of Justice requested additional information which the County later supplied. (Pls.' Ex. 33).

A. *Malapportionment of the September 8, 1981 and November 19, 1991 Plans*

Plaintiffs Alonzo Gonzalez, Jacinto Mendoza, Juan Oliverez, Gilberto Padilla, Michael Romero, Jose Rosillo, Jose Velasquez and Ana Ventura are United States citizens of Hispanic descent residing in Monterey County. On October 31, 1991, plaintiffs filed an action with this court seeking declaratory and injunctive relief pursuant to sections 2 et seq. and 5 of the Voting Rights Act, 42 U.S.C.A. §§ 1973 et seq., 1973c (West 1981). Plaintiffs argued that the court should enjoin the County from implementing the November 19, 1991 plan, as neither the Department of Justice nor the United States District Court for the District of Columbia had precleared the plan pursuant to Section 5 of the Voting Rights Act. (Complaint at 2). Even if the County succeeded in obtaining preclearance, plaintiffs argued, the November 19, 1991 plan impermissibly denied Spanish-speaking persons of Hispanic descent an equal opportunity to participate in the political process in violation of Section 2 of the Voting Rights Act. *Id.*

Defendant moved to dismiss plaintiffs' Complaint as a premature attempt to invalidate the November 19, 1991 plan before the County had an opportunity to seek preclearance under Section 5. (Def.Mem. Supp. Dismiss at 3). Defendant argued that the court lacked jurisdiction to enjoin enforcement of the November 19, 1991 plan. *Id.*

Prior to the court's ruling on the County's Motion to Dismiss, the Board of Supervisors adopted Ordinance No. 3604 on April 7, 1992 (the "April 7 Plan") and submitted that plan to the Department of Justice. Subsequently, the Department of Justice declared it had no objection to the April 7 Plan. The Department of Justice announced that it need not rule on the November 19, 1991 plan, as the April 7 Plan had superseded the November 19, 1991 plan. (Pls.' Ex. 34).

While the County's Motion to Dismiss remained under submission, the court granted two groups leave to intervene. Order of June 1, 1992. The first consisted of Jackie Craghead, an African–American, and Kenneth Nishi, an Asian–American, the City of Seaside and the City of Marina (the "Craghead Intervenors").[1] The Craghead Intervenors alleged the April 7 Plan was a product of the County's intentional discrimination against African–Americans and Asians in Seaside and Marina and moved the court for a preliminary injunction preventing the County from holding elections under the April 7 Plan.[2] The court also granted intervention to Donald

1. Craghead is a resident of Seaside, while Nishi resides in Marina. (Craghead Intervenors Opp. To Pls.' Mot. for Temporary Ct. Order at 3.) The court granted the Motion to Intervene of Seaside and Marina in a separate order filed July 2, 1992.

2. In open court, however, the Craghead Intervenors moved the court to defer its decision on their motion for a preliminary injunction. Accordingly, the court has deferred its decision on that motion until such time that the parties revive it. (Order of July 2, 1992).

Dunsford, Charmaine Cruchett, and Barbara Nelson, individually and on behalf of the Monterey County Committee for Fair Representation (the "Dunsford Intervenors"). Order of June 1, 1992.

The Dunsford Intervenors obtained the signatures of approximately 16,000 Monterey County voters who favored holding a referendum on the April 7 Plan pursuant to California Elections Code § 3753.[3] On June 4, 1992, the County Voter Registrar certified that the Dunsford Intervenors' voter petition contained a sufficient number of signatures to require the Board of Supervisors to either reconsider the April 7 Plan or submit the April 7 Plan for voter approval pursuant to California Elections Code §§ 3753, 3754. The Board of Supervisors voted to submit the April 7 plan for voter approval in the November 3, 1992 general election.

In a Memorandum of Decision filed July 2, 1992, the court granted the County's Motion to Dismiss plaintiffs' Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, giving plaintiffs 30 days leave to amend their Complaint. The court reasoned that the April 7 Plan had superseded the November 19, 1991 plan which plaintiffs' Complaint challenged. In addition, the court noted that the parties no longer favored adoption of the November 19, 1991 plan.

On July 13, 1992, plaintiffs filed their First Amended Complaint for declaratory and injunctive relief pursuant to sections 2 and 5 of the Voting Rights Act. Plaintiffs reiterated their earlier challenges to the November 19, 1991 plan and challenged the September 8, 1981 plan, as well.

The County moved to dismiss or stay plaintiffs' First Amended Complaint, arguing that the court's July 2, 1992 Memorandum of Decision ruled that the Board of

Supervisor's adoption of the April 7, 1992 plan precluded any challenge to the November 19, 1991 plan. In addition, the County argued that the court should dismiss plaintiffs' challenge to the September 8, 1981 plan, as the County did not intend to hold elections under that plan.

Questioning the County's contention that it did not intend to hold elections under the September 8, 1981 plan, the Craghead Intervenors moved for Summary Judgment on the ground that permitting the 1981 boundaries to continue in effect impermissibly extended the terms of incumbent supervisors elected under the 1981 plan and constituted a continuing injury to the County's African–Americans and Asian–Americans. (Craghead Intervenors' Mem.Supp.Summ.J. at 1).

On September 8, 1992, the court denied the County's Motion to Dismiss or Stay plaintiffs' First Amended Complaint and granted the Craghead Intervenors Motion for Summary Judgment against the September 8, 1981 plan. (Trial Mins. of September 8, 1992).

### B. Trial of the April 7 Plan

On September 8, 1992, the court commenced a bench trial on the merits of the April 7 Plan under Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the Constitution. On November 3, 1992, however, the County's voters defeated the April 7 Plan.[4] Accordingly, the court resumed its search for an interim redistricting plan.

### C. Challenge to the H4 Plan Under Section 5

When the court reconvened on November 9, 1992 plaintiffs and the Dunsford Intervenors presented two plans for the court's

---

**3.** California Elections Code § 3753 provides:

> If a petition protesting against the adoption of an ordinance is presented to the board of supervisors prior to the effective date of the ordinance, the ordinance shall be suspended and the supervisors shall reconsider the ordinance. The petition shall be signed by voters of the county equal in number to at least 10 percent of the entire vote cast within the

county for all candidates for Governor at the last gubernatorial election.

Cal.Elec.Code § 3753 (West 1977).

**4.** On October 13, 1992, the County moved for a Judgment on Partial Findings under Rule 52(c) of the Federal Rules of Civil Procedure. The defeat of the April 7 Plan in the November 3, 1992 referendum rendered the County's Rule 52(c) motion moot.

consideration: the Avila plan and the H4 plan. On November 10, 1992, the Board of Supervisors declared:

> With regard to the Gonzalez case, the Board unanimously votes not to support the Avila plan of September 4. On a three to two vote Supervisors Pennycook, Perkins and Karas vote to endorse the H4–P2.6 Plan and instructs outside counsel to support that plan with Supervisors Strasser Kauffman and Shipnuck voting no.

Minutes of November 10, 1992 Board Meeting. In response to the Board of Supervisors' November 10, 1992 meeting, plaintiffs' moved to bar the court from considering the H4 plan on the ground that the County's endorsement of the plan was a legislative action requiring section 5 preclearance.

## III. LEGISLATIVE IMPRIMATUR AND SECTION 5 PRECLEARANCE

Three redistricting plans are formally before the court: (1) the Avila plan; (2) Dunsford Intervenor Charmaine Cruchett's plan, the H4 Plan; and (3) Dr. Shelley Lapkoff's plan, the H5 Plan. (Pls.' Ex. 30; Dunsford Intervenors Ex. D–1). For the reasons stated below, the court finds, as a matter of law, that the Avila Plan is the only cognizable plan presently before the court.[5]

### A. *Standard Governing Section 5 Challenge*

Section 5 of the Voting Rights Act mandates that states or political subdivisions falling within the Act's purview preclear any "standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972" with the United States Attorney General before enacting or administering the same. 42 U.S.C.A. § 1973c (West 1981). Section 5 further provides that actions undertaken pursuant to Section 5 must be heard and determined by a three-judge court pursuant to 28 U.S.C. § 2284. *Id.*

Section 2284 of Title 28 of the United States Code provides:

> (1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, *unless he determines that three judges are not required,* immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge.

28 U.S.C.A. § 2284(b)(1) (emph. added) (West 1978). The court reads this provision as express authority that a single judge may make an initial determination of whether to convene a three judge court.

In determining whether to convene a three-judge court, a single judge has the authority to decide whether the complaint states a "substantial" claim. *Idlewild Bon Voyage Liquor Corp. v. Epstein,* 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962). A claim is insubstantial if " 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.' " *Connolly v. Pension Benefit Guaranty Corp.,* 673 F.2d 1110, 1114 (9th Cir.1982) (*quoting Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973) (citations omitted)).

### B. *Endorsement of the H4 Plan as Legislative Imprimatur*

The County and the Dunsford Intervenors argue that a legislature's endorsement of a redistricting plan does not constitute a legislative action where the legislature played no role in the plan's preparation and did not intend to enact or administer that plan.

On arguably distinguishable facts, the United States Supreme Court in *McDaniel v. Sanchez,* 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), ruled that Section 5 applied to circumstances in which a covered jurisdiction submits a redistricting plan that reflects the legislature's policy

---

**5.** In fact, the Monterey County Board of Supervisors redistricting plans for 1991–1992, are also before the court. (County's Ex. J*). The court has elected not to impose one of these plans unilaterally.

choices. A Department of Justice regulation mirrors the ruling in *Sanchez* by providing:

> (a) In general. Changes affecting voting that are ordered by a Federal court are subject to the preclearance requirement of section 5 to the extent that they reflect the policy choices of the submitting authority.

28 C.F.R. § 51.18 (1991).

The Dunsford Intervenors argue that plaintiffs' Section 5 claim is insubstantial because, unlike the legislative body in *Sanchez*, the Board of Supervisors did not prepare the H4 plan. Only later did the Board of Supervisors "endorse" the H4 plan. In addition, the Dunsford Intervenors contend that they are not a "submitting authority" within the meaning of 28 C.F.R. § 51.18 (1991).

Although not binding on this court, the Eastern District of New York's decision in *Puerto Rican Legal Defense & Educat. Fund v. Gantt*, 796 F.Supp. 681, 697 (E.D.N.Y.1992), *later proceeding*, 796 F.Supp. 698 (1992), is instructive on both points.

*Gantt* concerned the reapportionment of New York's state congressional districts. In a concurrent state court action, a court-appointed referee prepared a redistricting plan which the state legislature subsequently enacted. The federal district court proceeded to install the plan of its Special Master, declaring that the state court's plan was a legislative plan having no legal effect until the legislature actually precleared it pursuant to Section 5 of the Voting Rights Act. *Id.* at 698.[6]

■ The *Gantt* decision suggests that the reflection of legislative policy, not the author's identity or the developmental stage at which the legislature signals its concordance with the plan, determines whether the plan is legislative in character. This proposition is borne out by Congress' comments on S. 1279, the 1975 bill extending Section 5 by ten years. The Senate Committee on the Judiciary stated:

Section 5 review would not ordinarily be available ... where the court, because of exigent circumstances, actually fashions the plan itself instead of relying on a plan presented by a litigant. This is the limited meaning of the "court decree" exception recognized in *Connor v. Johnson*, 402 U.S. 690 [91 S.Ct. 1760, 29 L.Ed.2d 268] (1971). Even in these cases, however, if the governmental body subsequently adopts a plan patterned after the court's plan, Section 5 review would be required, ...

S.Rep. No. 94–295, 94th Cong., 1st Sess. at 19 (1975), *reprinted in* 1975 U.S.C.C.A.N. at 774, 785. The *Gantt* decision and the Senate Judiciary Committee's observations lead the court to believe it must extend the same treatment to a legislature's adoption of a litigant-fashioned plan as it would to a legislature's adoption of a court-ordered plan.

Finally, neither the County nor the Dunsford Intervenors have set forth cognizable reasons why the Board of Supervisors' use of the term "endorse" removes this case from the ambit of Section 5 which uses the term "enact". Moreover, the court has not found cases distinguishing endorsement and enactment in a legally and factually analogous framework.

■ This single-judge court lacks the authority to find that the H4 plan reflects the Board of Supervisors' policy objectives. The court is within the limits of its authority in saying that if the Department of Justice and the Supreme Court intend the phrase "reflects legislative policy" to apply to any redistricting plan to which a legislature affixes its seal of approval, then a substantial question of Section 5 coverage arises where any evidence suggestive of legislative imprimatur exists.

Accordingly, the court holds that the County's November 10, 1992 endorsement of the H4 plan presents a substantial question of coverage under Section 5 of the Voting Rights Act. The court emphasizes

---

**6.** The Justice Department later granted Section 5 preclearance to the state court plan, obviating the need for the Special Master's plan. *PRLD &*

*EF v. Gantt (Gantt II)*, 796 F.Supp. 698, 699 (E.D.N.Y.1992).

that this holding does not reach the merits of plaintiffs' Section 5 claims, but is a holding on the substantiality of those claims.

### C. *Legislature's De Facto Sponsorship of the H5 Plan*

Plaintiffs argue that the H5 plan Dr. Lapkoff prepared also carries the Board of Supervisors' imprimatur. Unlike the H4 plan, the Board of Supervisors did not vote on the H5 plan. Monterey County agreed to pay Dr. Lapkoff for her work in developing the H5 plan. Dr. Lapkoff used the H4 plan as a starting point for the development of the H5 plan, modifying the H4 plan where desired. Finally, Dr. Lapkoff testified that counsel for Monterey County, Lee L. Blackman, Esq., discussed various district formations with her at several stages of the H5 plan's development.

The court makes two observations with regard to the H5 plan. First, although the Board of Supervisors did not vote on the merits of the H5 plan, the court found that the H5 plan contained the same basic structure as the H4 plan. The Senate Judiciary Committee has observed that "[i]n some Section 5 cases, a change in the voting practice or procedure may also retain some features of the previous system, and all aspects of such a change are within the reach of Section 5." S.Rep. No. 94–295, 94th Cong., 1st Sess. at 19, *reprinted in* 1975 U.S.C.C.A.N. 774, 785. The Committee's statement suggests that Congress intended Section 5 to be broad enough to encompass redistricting plans that may ultimately prove to be outside Section 5's scope.

Second, Section 5 covers legislative enactments as well as legislative efforts to administer redistricting plans. 42 U.S.C.A. § 1973c. While the County and the Board of Supervisors are not identical entities, the County's financial support of Dr. Lapkoff's work on the H5 plan and Mr. Blackman's role, however limited, in that plan's devel-

opment raises the specter of legislative approval.

■ The Supreme Court has repeatedly hearkened to the "well-settled rule that § 5 is to be given a broad construction." *Sanchez*, 452 U.S. at 149, 101 S.Ct. at 2236 (*citing Dougherty County Board of Education v. White*, 439 U.S. 32, 38, 99 S.Ct. 368, 372, 58 L.Ed.2d 269 (1978) (citations omitted)). In light of the Supreme Court's broad construction of Section 5 and the important role Section 5 plays in advancing minority political participation,[7] the court holds that the possible derivation of the H5 plan from the H4 plan; the County's financial support of the H5 plan; and Mr. Blackman's participation in the development of the same all give rise to a substantial question as to whether the County must preclear the H5 plan with the Department of Justice or the United States District Court for the District of Columbia. 42 U.S.C.A. § 1973c.

### IV. OPPORTUNITY FOR LEGISLATURE TO CONSIDER IMPORTANT INTERESTS IN FORMULATING QUALIFIED PLAN

Rather than convene a three-judge court or select the Avila plan at this time, the court exercises its discretion to delay the special election in order to afford the County an opportunity to consider the competing interests in this case.   .

Even "[w]hen a federal court declares an existing apportionment scheme unconstitutional, it is ... appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements...." *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). In delaying the election, foremost in the court's mind is the Supreme Court's observation that a "legislature is ... by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population

---

7. "[T]he Committee is convinced that it is largely Section 5 which has contributed to the gains thus far achieved in minority political participation. Moreover, it is Section 5 which serves to insure that this progress shall not be destroyed through new procedures and techniques." S.Rep. No. 94–295, 94th Cong., 1st Sess. at 19, *reprinted in* 1975 U.S.C.C.A.N. at 785.

equality." *Connor v. Finch*, 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977).

■ The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution dictates that redistricting plans achieve fair representation for all citizens. *Reynolds v. Sims*, 377 U.S. 533, 566, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506 (1964). On the other hand, California recognizes the importance of "(a) topography, (b) geography, (c) cohesiveness, contiguity, integrity, and compactness of territory, and (d) community of interests" in drawing legislative districts. Cal.Elec.Code § 35101 (West 1989 & Supp.1992).

### A. Minority Voting Strength

According to the United States 1990 Federal Census, Hispanics comprised 33.6% of the County's population. Despite the size of the County's Hispanic population, the County's voters have not elected a Hispanic person to the Board of Supervisors since the 1890 election of Juan Castro.

■ The court is fully aware that neither the Constitution nor the Voting Rights Act require states or their political subdivisions to guarantee that ethnic minorities secure legislative office in proportion to their numbers. *See White v. Regester*, 412 U.S. 755, 765–766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973). Courts and legislatures may, however, constitutionally supply minorities with a redistricting plan that affords them an opportunity for "representation reasonably equivalent to their political strength...." *City of Richmond v. United States*, 422 U.S. 358, 370, 95 S.Ct. 2296, 2303, 45 L.Ed.2d 245 (1975).

All parties agree that the County's African-American and Asian/Pacific Islander populations are insufficient to create a majority district, separately or collectively.[8] Plaintiffs and the County disagree, however, on what the court should deem to be a fair level of representation for the County's Hispanics.

Plaintiffs contend that fairness requires the court to give Hispanics a "significant opportunity" to elect candidates to the Board of Supervisors by creating two supervisorial districts, each with Hispanic populations exceeding 60%. (Tr. of November 19, 1992 at 2121). The County contends that the creation of two districts with Hispanic populations exceeding 60% is tantamount to granting Hispanics a right to elect supervisors to 40% of the available Board seats, although they comprise only 33% of the County's total population.

■ To the extent it does not dilute the voting power of other ethnic groups, the court is neither required to maximize nor prohibited from maximizing the opportunity of Hispanics to obtain representation on the Board of Supervisors. In *United Jewish Orgs. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), the Supreme Court rejected the proposition that, absent a showing of past unconstitutional apportionment, the Constitution prevents states from deliberately creating or preserving African-American majorities to secure a redistricting plan's compliance with Section 5. The Court declared:

> neither the Fourteenth nor the Fifteenth Amendment mandates any *per se* rule against using racial factors in districting and apportionment ... The permissible use of racial criteria is not confined to eliminating the effects of past discriminatory districting or apportionment.

*Id.* at 161, 97 S.Ct. at 1007.

Indeed, the Ninth Circuit Court of Appeal has stated that the "deliberate construction of minority controlled voting districts is exactly what the Voting Rights Act authorizes." *Garza v. County of Los Angeles*, 918 F.2d 763, 776 (9th Cir.1990). Moreover, as in *Garza*, the County in the instant case does not, and cannot truthfully, contend that the maximization of Hispanic voting strength would dilute the voting strength of the County's Anglo community. *Id.*

---

**8.** Under the 1990 Census, African-Americans comprised 6.4% of the County's population, while Asian and Pacific Islanders comprised

7.8% of the County's population. (Dunsford Intervenors' Ex. D–1).

## B. *Preservation of Legitimate Community Interests*

The Supreme Court has permitted deviations from the one-person-one vote requirement of the Fourteenth Amendment to the Constitution where justified by the furtherance of clear state policies. *See, e.g., Karcher v. Daggett,* 462 U.S. 725, 740–41, 103 S.Ct. 2653, 2663–64, 77 L.Ed.2d 133 (1983). As noted above, the California Elections Code identifies the maintenance of "community of interests" in drawing legislative districts as a policy of the State of California. Cal.Elec.Code § 35101 (West 1989 & Supp.1992).

To create two districts with Hispanic populations exceeding 60%, Mr. Avila has placed a portion of northern Monterey County and all of southern Monterey County into a single district.[9] North County residents contend that a single supervisor cannot advance the interests of these two regions without doing a disservice to one.

The agriculture industry, albeit of different magnitudes, is common to both North and South County. Where North and South County differ is in the provision of municipal services. North County lacks municipal services. In contrast, South County has four urban centers, Gonzalez, Greenfield, King City and Soledad, each furnishing South County residents with various public services. The court advises the parties to give further consideration to the North County community of interests in an effort to afford this region more harmonious representation.

Unfortunately, only with great difficulty can one maximize the voting strength of the County's Hispanic community and still preserve the legitimate community interests of North County. In balancing the advancement of minority voting strength against the preservation of legitimate community interests, the parties are reminded that while the maintenance of community interests is a permissible consideration, racial fairness is mandatory.

## V. CONSEQUENCES OF COUNTY'S FAILURE TO OBTAIN QUALIFIED PLAN

If the County disregards this opportunity to devise a redistricting plan of its own or if the Department of Justice does not pre-clear any plan the County might propose, the court will install a interim redistricting plan. *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1970). Should either event arise, the court's present inclination is to utilize the Avila Plan, subject to certain modifications.

Rather than venture into an in-depth analysis of an exclusive list of plausible modifications to the Avila Plan, the court makes two observations. First, if the Avila Plan remains under consideration as an interim plan, the court may wish to modify that plan to buttress the existing North County community of interests.

Second, the parties will need to address the implications of renumbering the supervisorial districts to conform with the Avila Plan. The Avila Plan would require the court to renumber the County's supervisorial districts, thereby advancing the date by which Supervisor Barbara Shipnuck, representing the City of Salinas, must defend her seat. In response to the County's concerns, the court makes several observations.

The Supreme Court regards state policies favoring the avoidance of contests between incumbent legislators as a legitimate justification for minor population deviations, provided the state does not have a discriminatory purpose in preserving incumbency. *Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983) ("Any number of consistently applied legislative policies might justify some variance, including ... avoiding contests between incumbent Representatives."). *Id.* The court does not now address whether the County has a discriminatory purpose in seeking to preserve the incumbency of those supervisors not ordinarily subject to reelection on June 8, 1993.

The County does not present nor has the court found federal legal authority for the

---

9. The court refers to district 2 in the Avila plan (Pls.' Ex. 30).

proposition that a court-ordered plan may not shorten the terms of incumbents absent a Section 2 violation. In cases not involving Section 2 violations, federal district courts in other circuits have shortened the terms of officials elected under unconstitutional redistricting schemes. *See, e.g., Wallace v. House*, 377 F.Supp. 1192, 1201 (W.D.La.1974); *Swann v. Adams*, 263 F.Supp. 225, 228 (S.D.Fla.1967) (three-judge court); *Keller v. Gilliam*, 454 F.2d 55, 57–58 (5th Cir.1972).

California law provides that "[t]he term of office of any supervisor who has been elected and whose term of office has not expired shall not be affected by any change in the boundaries of the district from which he or she was elected." Cal.Elec.Code § 35006 (West 1989). Louisiana law contains similarly unequivocal language: "If reapportionment be necessary it shall be made effective at the end of the term of the incumbent officials". *Chargois v. Vermilion Parish School Board*, 348 F.Supp. 498, 501 (W.D.La.1972), *quoting* LSA–R.S. 33:1411(b). Nonetheless, the district court in *Chargois*, 348 F.Supp. at 501, departed from Louisiana's clear policy objectives after noting the gross malapportionment of the districts then in place. ("Since all the current members of both bodies were elected from concededly malapportioned districts, they cannot continue to serve any longer than is absolutely necessary."). *Id.* While the court has not ruled on the constitutionality of the County's present districting scheme, the County concedes that the September 8, 1981 plan is malapportioned. (Tr. of June 29, 1992 at 64–65: "[T]he 1981 plan, which we acknowledge—call it a stipulation, if you want—is malapportioned in the sense that, under the way the census has shown the numbers, they are not substantially equal.").

The court need not decide whether to renumber the County's districts at this juncture. The possibility remains that the County may obtain preclearance of a redistricting plan which does not shorten the terms of any incumbents. In addition, Mr. Avila might modify his plan to obviate the need for renumbering the County's districts.

## VI. CONCLUSION AND DISPOSITION

The court will not now consider the H4 and H5 plans, as both raise substantial questions of coverage under Section 5 of the Voting Rights Act.

The date for the special election in those supervisorial districts which were regularly scheduled for election on November 3, 1992, is presently set for March 2, 1993. That special election date is ORDERED DEFERRED until June 8, 1993.

The County of Monterey shall undertake with all deliberate speed to obtain preclearance of a duly adopted redistricting plan, pursuant to Section 5 of the Voting Rights Act. If the County does not present the court with a precleared plan on or before February 26, 1993, the court will order an interim plan which will establish supervisorial districts for the conduct of the election now scheduled for June 8, 1993.

On the basis of the evidence now before it, if the adoption of an interim plan becomes necessary, the court would be inclined to adopt the Plaintiffs' Exhibit 30, the plan dated September 4, 1992, submitted by Joaquin Avila, Esq., subject to modification in some particulars.

The parties are advised that the court will not consider further delays of the election at this juncture.